

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-12-1997

# Ernst v. Child & Youth Ser

Precedential or Non-Precedential:

Docket 93-1929,93-1930,94-1273

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Ernst v. Child & Youth Ser" (1997). *1997 Decisions.* Paper 60.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/60

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

```
                UNITED STATES COURT OF APPEALS
                    FOR THE THIRD CIRCUIT
                    _____

            N0S. 93-1929, 93-1930 and 94-1273
                    _____

                      SYLVIA ERNST
                 Appellant in No. 93-1929

                          v.

            CHILD AND YOUTH SERVICES OF CHESTER COUNTY;
    CAROL SCHRAVAZANDE; ARDEN OLSON; WAYNE STEVENSON; RITA BORZILLO;
         THE JUDICIARY OF THE COMMONWEALTH OF PENNSYLVANIA

        *Sylvia Ernst, Administrator of the Estate of Susanne Ernst,
                      for Susanne Ernst
            *(Amended as per the Court's 5/31/96 Order)

                    _____

                      SYLVIA ERNST

                          v.

            CHILD AND YOUTH SERVICES OF CHESTER COUNTY;
    CAROL SCHRAVAZANDE; ARDEN OLSON, WAYNE STEVENSON; RITA BORZILLO;
         THE JUDICIARY OF THE COMMONWEALTH OF PENNSYLVANIA;

        *Sylvia Ernst, Administrator of the Estate of Susanne Ernst
                      for Susanne Ernst

                    Rita K. Borzillo,
                 Appellant in No. 93-1930

            *(Amended as per the Court's 5/31/96 Order)

                    _____

                      SYLVIA ERNST

                          v.

            CHILD AND YOUTH SERVICES OF CHESTER COUNTY;
    CAROL SHRAVAZANDE; ARDEN OLSON, WAYNE STEVENSON; RITA BORZILLO;
         THE JUDICIARY OF THE COMMONWEALTH OF PENNSYLVANIA;

        *Sylvia Ernst, Administrator ofthe Estate of Susanne Ernst
                      for Susanne Ernst

                    Rita K. Borzillo, Esq.
```

Appellant
*(Amended as per the Court's 5/31/96 Order)

---

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 91-cv-03735)

---

Argued June 12, 1996

BEFORE:  STAPLETON, GREENBERG, and ALDISERT, <u>Circuit Judges</u>

(Opinion Filed March 12, 1997)

---

Edward A. Hartnett (Argued)
Seton Hall University School of Law
One Newark Center
Newark, NJ 07102
 Attorney for Sylvia Ernst
 Appellant in No. 93-1929

Robert B. Gidding (Argued)
44 Union Avenue
Bala Cynwyd, PA 19004
 Attorney for Sylvia Ernst
 Cross Appellee in Nos. 93-1930
 and 94-1273

Thomas L. Whiteman (Argued)
Office of County Solicitor
2 North High Street
Courthouse, Suite 7
West Chester, PA 19380
 Attorney for Carol Schravazande
 Appellee\Cross Appellant

Joseph P. Green, Jr. (Argued)
Duffy & Green
10 North Church Street, Suite 307
West Chester, PA 19280
 Attorney for Rita Borzillo
 Appellee\Cross Appellant

David M. Donaldson (Argued)
Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414

2

Philadelphia, PA 19102
 Attorney for Judiciary of the
 Commonwealth of Pennsylvania
 Appellee\Cross Appellant

Thomas W. Corbett, Jr.
Attorney General
Gregory R. Neuhauser (Argued)
Senior Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr, III
Chief Deputy Attorney General
Office of Attorney General of PA
15th Floor, Strawberry Square
Harrisburg, PA 17120
 Attorneys for Commonwealth of
 Pennsylvania, Amicus Curiae\Appellee\
 Cross Appellant

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

A grandmother alleges in this civil rights action that she was deprived of the custody of her granddaughter for five years in violation of rights secured by the Constitution. The defendants are Chester County Children & Youth Services ("CYS"), individual CYS caseworkers, and an attorney retained by CYS to represent it in the judicial proceedings that transferred custody to the state. We are called upon to decide whether and to what extent child welfare workers and attorneys who represent child welfare agencies are entitled to absolute immunity for actions taken in connection with dependency proceedings in state court. This is an issue of first impression in this circuit. Like the

3

other courts of appeals that have addressed the issue, we hold that child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state are entitled to absolute immunity from suit for all of their actions in preparing for and prosecuting such dependency proceedings.

## I.  Facts[1]

Sylvia Ernst ("Ernst") was the sole guardian of her minor granddaughter Susanne from infancy until the child was nine years old.[2]  At about that time, during the 1987-88 school year, a number of people in the Downingtown, Pennsylvania area where Ernst and Susanne lived became concerned about Susanne's well-being.  A mover who had moved Ernst and Susanne into an apartment in Downingtown contacted police and expressed concern that there was something wrong in the relationship between Ernst and Susanne.  He reported that Susanne looked unwell and appeared too young to be Ernst's daughter.

The Downingtown police conducted an investigation and learned that the Family Court of Nassau County, New York, had issued warrants for the arrest of Ernst and her daughter for child neglect and that a petition for custody of Susanne had been filed in 1981 but never served on Ernst.  Nassau County officials informed the Downingtown police that the warrants had been

---

1.  We accept the extensive findings of fact made by the district court after a trial on the merits.

2.  Susanne's father is believed to be deceased, and her mother has had only occasional telephone contact with Susanne and Ernst since Susanne was two years old.

4

vacated and the petition for custody of Susanne had been withdrawn. The police informed a CYS employee of its investigation and of the status of the warrants, but the CYS personnel responsible for the decision to seek custody of Susanne were apparently unaware at the time of their decision that the Nassau County warrants had been withdrawn.

School officials at several schools Susanne attended became concerned about Susanne's frequent tardiness, poor attendance, and inability to separate from Ernst at the start of the school day. The days would often begin with a scene outside Susanne's classroom during which Susanne would cry and scream and refuse to let go of her grandmother. On May 3, 1988, after another morning tantrum, officials at the East Ward School in Downingtown contacted CYS and requested immediate intervention. CYS believed Susanne's attachment to Ernst was sufficiently extreme to be unhealthy and filed a petition that same day seeking an adjudication of dependency[3] and emergency custody of Susanne. After an immediate detention hearing, Judge Stively of the Chester County Court of Common Pleas found that a prima facie

---

3. A child is "dependent" under Pennsylvania law if he or she is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa. C.S.A. § 6302.

The dependency petition filed for Susanne contained a number of false allegations regarding her attendance records and the Nassau County warrants and custody petition. However, the Court of Common Pleas later ruled that the errors were harmless because they did not form the basis of its subsequent adjudication of dependency.

5

case of dependency had been presented, and ordered Susanne placed in a psychiatric institution for a complete evaluation.

At a subsequent hearing on May 18, 1988, the parties stipulated to an adjudication of dependency, which resulted in temporary legal custody remaining with CYS. The stipulation provided that CYS's goal was the reunification of the family and that Ernst could receive counseling and treatment at the institution at which Susanne was being treated.

CYS retained custody of Susanne for the next five years. During that time, Ernst and CYS waged an intense legal battle over Susanne's dependency status and custody. They also developed an extremely contentious relationship. CYS caseworkers found Ernst to be uncooperative, antagonizing, and unwilling to acknowledge her parenting problems. They also complained that she frequently made negative comments about CYS and Susanne's foster families during visits with Susanne. As CYS caseworkers became increasingly frustrated with Ernst, they sought and obtained restrictions on her visits with Susanne. Ultimately, with the approval of the Chester County Court of Common Pleas and the Superior Court of Pennsylvania, they changed CYS's goal for Susanne from family reunification to long-term foster placement. Meanwhile, Susanne occupied eight different placements at various foster homes and institutions. Ultimately, her emotional and intellectual development deteriorated significantly.

Finally, in April 1993, a new judge assigned to review Susanne's placement recognized that "[t]he adversarial air of the

6

proceeding [concerning Susanne's dependency] ... at times ... captured the focus of many of those involved in this case instead of focusing on Susanne." Juvenile No. 83 CS 88, Order of April 26, 1993, Op. at 2. Concluding that "[w]e have come to the point where state intervention in Susanne's life is now doing more harm than good," the court ordered that physical custody of Susanne be returned to Ernst, with legal custody remaining with CYS. Ernst was granted legal custody on November 17, 1993.

During the pendency of the state court proceedings, Ernst filed this action in federal court under 42 U.S.C. § 1983 against CYS, various CYS caseworkers who were involved in Susanne's case (the "CYS defendants"), three officials from the Downingtown Area School District, and Rita Borzillo, a private attorney who represented CYS throughout Susanne's dependency proceedings. Ernst's complaint alleged (1) violation of procedural and substantive due process by all defendants for their improper "seizure" of Susanne; (2) violation of substantive due process by CYS, the CYS defendants, and Borzillo for the imposition of restrictions on visitation and for the recommendation of long-term placement instead of reunification; (3) violations of procedural due process in the course and conduct of state court proceedings; and (4) violation of the First Amendment by the Pennsylvania statute that presumptively closes juvenile dependency proceedings to the public. The district court joined the Judiciary of the Commonwealth of Pennsylvania to defend the First Amendment claim.

The district court granted summary judgment to the Downingtown School officials on statute of limitations grounds, and to all defendants on all claims alleging procedural due process violations before May 24, 1991 on the ground that those claims had been fully and fairly litigated in state court. The court granted partial summary judgment to the CYS defendants and Borzillo, ruling that they were entitled to absolute immunity "insofar as they acted in their prosecutorial capacity of filing petitions and making recommendations to the court." The court held that the CYS defendants were <u>not</u> entitled to absolute immunity, however, for actions taken in their capacities as social workers <u>formulating</u> recommendations to be made to the court. The court further held that Borzillo was not entitled to absolute immunity for actions taken in an "extra-prosecutorial" capacity.

A bench trial ensued on the claims that survived summary judgment. After the trial, the court granted judgment to CYS, the CYS defendants, and the Judiciary of Pennsylvania. Although the court criticized the CYS defendants for flawed social work practice and inability "to submerge their personal views in dealing with a difficult woman" and focus on Susanne's welfare, <u>Ernst v. Chester County Children & Youth Servs.</u>, No. CIV. A. 91-3735, 1993 WL 343375, at *23 (E.D. Pa. Sept. 3, 1993), it ultimately concluded that the CYS defendants' actions "were not so devoid of professional judgment or so clearly outrageous as to impose liability for constitutional violations." <u>Id.</u> The

8

court held that CYS was not liable for any violations by the CYS defendants or Borzillo because Ernst had not shown that the actions were done by an official with policy-making authority or pursuant to a "policy" or "custom" of CYS. Finally, the district court held that Ernst lacked standing to bring her First Amendment challenge to Pennsylvania's juvenile court closure provision because she could not raise the right of the "third-party" public and press to access to the courts.

On the other hand, the court granted judgment in favor of Ernst against Borzillo. The court held that Borzillo, who was a state actor for purposes of § 1983 while she represented CYS, violated Ernst's substantive due process rights when she sought appellate review of an order granting Ernst an unsupervised visit with Susanne. The court found that Borzillo challenged the order primarily out of "animosity and anger at Ernst's small victory" in securing permission for an unsupervised visit. Id. at *25. Nevertheless, the court found that the harm suffered by Ernst as a result of Borzillo's actions was de minimis, consisting only of the difference between the value of the unsupervised visit ordered and the supervised visit Ernst actually had with Susanne, and awarded only nominal damages and attorneys' fees.

Ernst timely appealed the district court's judgments against her on the substantive due process and First Amendment claims, and Borzillo cross-appealed. We will affirm the judgments against Ernst in favor of the CYS defendants, albeit on the alternative ground that the CYS defendants are absolutely

9

immune for all of their actions in preparing for and prosecuting Susanne's dependency proceedings. We will also affirm the judgments in favor of CYS and the Judiciary of Pennsylvania. However, we will reverse the judgment against Borzillo on the ground that she is entitled to absolute immunity for the actions for which she was held liable by the district court.

## II. Jurisdiction

Because the federal courts are courts of limited jurisdiction, we must first satisfy ourselves that we have jurisdiction over this appeal and cross-appeal.

### A. Rooker-Feldman Doctrine

The CYS defendants contend that the district court lacked jurisdiction to entertain Ernst's suit under the Rooker-Feldman doctrine, which prohibits federal courts from exercising "subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (quoting Blake v. Papadakos, 953 F.2d 68, 71 (3d Cir. 1992) (alteration in original); District of Columbia Ct. of Appeals v. Feldman, 460 U.S. 462, 483 n.16 (1983)). According to the CYS defendants, the Rooker-Feldman doctrine precluded the district court from hearing Ernst's § 1983 claims because to decide those claims required the court to

10

determine whether the state courts correctly adjudicated Susanne a dependent. We disagree, and find <u>Rooker-Feldman</u> inapplicable here.

The <u>Rooker-Feldman</u> doctrine is based on the statutory provision that grants the Supreme Court jurisdiction to review the decisions of the highest state courts for compliance with the Constitution. <u>See</u> 28 U.S.C. § 1257. Because this jurisdiction is reserved exclusively to the Supreme Court, it is improper for federal district courts to exercise jurisdiction over a case that is the functional equivalent of an appeal from a state court judgment. <u>See</u> <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 415-16 (1923). As this court recently explained:

> When a plaintiff seeks to litigate a claim in a federal court, the existence of a state court judgment in another case bars the federal proceeding under <u>Rooker-Feldman</u> only when entertaining the federal court claim would be the equivalent of an appellate review of that order. For that reason, <u>Rooker-Feldman</u> applies only when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual.

<u>FOCUS</u>, 75 F.3d at 840 (citations omitted). Those circumstances are not present here.

Although Ernst's Third Amended Complaint sought her appointment as Susanne's legal guardian, which was the relief that she had been unable to obtain in the state courts, that portion of the complaint was mooted when the state court returned

11

Susanne to Ernst's custody.  Thus, the district court was left to decide only Ernst's § 1983 claims for damages, which were grounded primarily in her allegations that the defendants violated her right to substantive due process when they formulated and made recommendations to the state court regarding Susanne's dependency.  The Rooker-Feldman doctrine did not preclude the district court from deciding those claims because a ruling that the defendants violated Ernst's right to substantive due process by making recommendations to the state court out of malice or personal bias would not have required the court to find that the state court judgments made on the basis of those recommendations were erroneous.

Moreover, it is clear that deciding the substantive due process claims did not involve federal court review of a state court decision because Ernst's substantive due process claims were never decided by the state court.  Although Ernst mentioned her concerns about bias on the part of the CYS defendants during the dependency proceedings, she did not articulate those concerns in constitutional due process terms.  Neither did--or could--the state court base any decision regarding Susanne's dependency on a determination that Ernst's claims of bias or improper motive were invalid.  Cf. Valenti v. Mitchell, 962 F.2d 288, 296 (3d Cir. 1992) (holding that a party cannot escape Rooker-Feldman by raising a new constitutional theory in federal court unless the party lacked a realistic opportunity to fully and fairly litigate the constitutional claim in the state court proceeding);

12

Centifanti v. Nix, 865 F.2d 1422, 1433 (3d Cir. 1989). A dependency adjudication involves a determination that a child is without proper parental care or control, 42 Pa. C.S.A. § 6302; In the Interest of J.M., 652 A.2d 877, 880 (Pa. Super. 1995), and subsequent decisions regarding custody and placement are made on the basis of the best interests of the child. 42 Pa. C.S.A. § 6351; In the Interest of Laura Sweeney, 574 A.2d 690, 691 (Pa. Super. 1990). Neither an adjudication of dependency nor a determination of the appropriate disposition of a dependent child is based on the intentions or states of mind of the party seeking the dependency adjudication. Therefore, a finding that the CYS defendants violated Ernst's right to substantive due process would not have involved the invalidation of any conclusion or judgment reached by the state court.[4] Accordingly, the Rooker–Feldman doctrine did not preclude the court from exercising jurisdiction over Ernst's substantive due process claims against the CYS defendants. We have jurisdiction over the appeal therefrom pursuant to 28 U.S.C. § 1291.

4. For this reason, the CYS defendants' contention that Ernst's § 1983 claims are barred by the doctrine of collateral estoppel also fails. Because the state court never made any decision regarding whether the defendants, in formulating recommendations to the state court regarding Susanne's dependency status, violated Ernst's substantive due process rights, the district court here was not precluded by the doctrine of collateral estoppel from entertaining Ernst's substantive due process claims. See O'Leary v. Liberty Mutual Ins. Co., 923 F.2d 1062, 1065–66 (3d Cir. 1991) ("Under Pennsylvania law, ... a prior determination of a legal issue is conclusive in a subsequent action between the parties on the same or a different claim when (1) the issue was actually litigated; (2) the issue was determined by a valid and final judgment; and (3) the determination was essential to the judgment.").

13

## B.  Cross-Appeal

Ernst argues that this court lacks jurisdiction to entertain Borzillo's cross-appeal because Borzillo did not file a timely notice of appeal from the district court's immediately appealable interlocutory denial of her motion for summary judgment on the grounds of absolute immunity.[5]  Instead, she waited and appealed from the final judgment against her. We reject Ernst's argument because we hold that an interlocutory appeal from a denial of summary judgment on immunity grounds, although permitted, is not obligatory.

This court has not yet addressed the specific issue of whether a party that fails to file an appeal within 30 days after entry of an immediately appealable interlocutory order denying summary judgment on immunity grounds forfeits the right to challenge that denial on appeal from the final judgment. However, we have adopted the general rule that "[i]f matters are adjudged by an interlocutory decree that is subject to immediate appeal, and no appeal is taken, they are not foreclosed, but are subject to review on appeal from the final judgment," 9 Moore's Federal Practice § 110.18, at 194 (1996); id. at 195 n.2 (citing cases); see also 15A Wright & Miller, Federal Practice &

_____

5.  An order denying summary judgment on immunity grounds is immediately appealable because an immediate appeal is necessary to adequately protect the government official's interest in avoiding the time and expense of litigation.  See Mitchell v. Forsyth, 472 U.S. 511. 525 (1985); Giuffre v. Bissell, 31 F.3d 1241, 1245 (3d Cir. 1994).

14

Procedure § 3911, at 359 & n.78 (citing cases), in another

context.  Victor Talking Mach. Co. v. George, 105 F.2d 697, 699

(3d Cir. 1939) (holding that interlocutory appeal from

interlocutory injunction is permissive rather than mandatory, and

injunction thus may be challenged on appeal from either the

interlocutory order or the final judgment).  The Seventh Circuit

has described the rationale for the general rule:

> Although a party has a right to take an immediate
> appeal, there is no obligation to do so....
> A rule that required people to appeal from
> potentially "final" decisions not embodied in
> separate documents [within the meaning of
> Fed. R. Civ. P. 58] would lead to a blizzard
> of protective appeals as litigants tried to
> ensure their rights to review; many times the
> rule would lead to pointless forfeitures as
> litigants overlooked the possibility that a
> particular order might be characterized as a
> "final decision."

Exchange Nat'l Bank of Chicago v. Daniels, 763 F.2d 286, 290 (7th

Cir. 1985) (emphasis in original).  Moreover, "[m]aking

interlocutory appeals ... mandatory would turn the policy against

piecemeal appeals on its head."  Hunter v. Department of Air

Force Agency, 846 F.2d 1314, 1316 (11th Cir. 1988) (quoting In re

Chicken Antitrust Litigation, 669 F.2d 228, 236 (5th Cir. 1982)).

We can see no meaningful distinction between

interlocutory orders denying summary judgment on immunity grounds

and other appealable interlocutory orders.  Accordingly, we think

it appropriate to extend the general rule to interlocutory orders

denying summary judgment on immunity ground.  See McIntosh v.

Wienberger, 810 F.2d 1411, 1431 n.7 (8th Cir. 1987) (applying

15

general rule to orders denying summary judgment on immunity grounds because the interest in protecting public officials from monetary liability for official acts survives even after a trial has been held).  Therefore, Borzillo did not forfeit her right to appeal the district court's denial of her motion for summary judgment on immunity grounds by waiting to file a notice of appeal until after entry of a final judgment against her.  We thus have jurisdiction to consider the immunity issue raised in her cross-appeal.

### III. Ernst's Appeal

#### A. CYS Defendants' Absolute Immunity

Ernst challenges the district court's grant of partial summary judgment to the CYS defendants based on absolute immunity "insofar as they acted in their prosecutorial capacity of filing petitions and making recommendations to the court." Order of Jan. 27, 1993. She contends that the CYS defendants cannot claim entitlement to immunity from suit under § 1983 because child welfare workers employed by the state did not exist, and thus enjoyed no immunity from suit at common law, in 1871 when § 1983 was enacted. Although we recognize that state-employed social workers enjoyed no common law immunity from suit in 1871, we nonetheless hold that the CYS defendants are entitled to absolute immunity for their actions in petitioning and in formulating and making recommendations to the state court because those actions are analogous to functions performed by state prosecutors, who were immune from suit at common law.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured." 42 U.S.C. § 1983 (emphasis added). Despite its broad language, the Supreme Court has consistently held that this provision did not abolish long-standing common law immunities from civil suits. See Burns v. Reed, 500 U.S. 478, 484 (1991)

17

(citing <u>Pierson v. Ray</u>, 386 U.S. 547, 554 (1967)); <u>Imbler v. Pachtman</u>, 424 U.S. 409, 418 (1976). Instead, courts must determine whether a particular governmental official is entitled to immunity according to the following analysis:

> [The] initial inquiry is whether [the] official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts. If "an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions."

<u>Malley v. Briggs</u>, 475 U.S. 335, 340 (1986) (quoting <u>Tower v. Glover</u>, 467 U.S. 914, 920 (1984)). Courts "look to the common law and other history for guidance because [their] role is 'not to make a freewheeling policy choice,' but rather to discern Congress' likely intent in enacting § 1983." <u>Burns</u>, 500 U.S. at 493 (quoting <u>Malley</u>, 475 U.S. at 342).

The fact that a particular public official did not enjoy absolute immunity at common law is not, however, determinative of the absolute immunity issue. Where the official claiming immunity occupies a governmental position that did not exist at common law, he may still be entitled to immunity if he performs official functions that are analogous to functions performed by those who were immune at common law. See <u>Butz v. Economou</u>, 438 U.S. 478 (1978) (holding that officials who perform quasi-judicial and quasi-prosecutorial functions in administrative agency adjudications are entitled to the same

18

immunities afforded to judges and prosecutors at common law); see also Forrester v. White, 484 U.S. 219, 224 (1988) ("Running through our cases, with fair consistency, is a 'functional' approach to immunity questions other than those that have been decided by express constitutional or statutory enactment.  Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.").  It is therefore necessary for us to review the functions performed by officials to whom absolute immunity has been accorded in order to determine if child welfare workers perform analogous functions.

Under its historical and functional approach, the Supreme Court has held that certain officials "functioning as integral parts of the judicial process" are absolutely immune from civil suits under § 1983.  McArdle v. Tronetti, 961 F.2d 1083, 1084 (3d Cir. 1992).  For example, the Court has declared that judges, Pierson v. Ray, 386 U.S. 547 (1967), prosecutors, Imbler v. Pachtman, 424 U.S. 409 (1976), and witnesses, Briscoe v. LaHue, 460 U.S. 325 (1983), are entitled to absolute immunity when they perform judicial or quasi-judicial acts that are integral parts of the judicial process.

In Imbler v. Pachtman, the Court held that prosecutors were absolutely immune at common law from civil liability for malicious prosecution and that public policy considerations

19

countenanced a similar absolute immunity from suits under § 1983.
424 U.S. at 424.  The relevant public policy considerations were
numerous.  First, a prosecutor's exercise of his independent
judgment would likely be compromised if he were threatened with
suits for damages for his actions in initiating and prosecuting
criminal cases in court.  Id. at 424-25.  Such suits "could be
expected with some frequency, for a defendant often will
transform his resentment at being prosecuted into the ascription
of improper and malicious actions to the State's advocate."  Id.
at 425.  Second, the prosecutor's energy would be diverted from
his official duties if he were forced to defend himself against
§ 1983 actions.  Id.  Third, defending against § 1983 actions
likely would be particularly difficult for a prosecutor:

> [T]he honest prosecutor would face greater difficulty
> in meeting the standards of qualified
> immunity than other executive or
> administrative officials.  Frequently acting
> under serious constraints of time and even
> information, a prosecutor inevitably makes
> many decisions that could engender colorable
> claims of constitutional deprivation.
> Defending these decisions, often years after
> they were made, could impose unique and
> intolerable burdens upon a prosecutor
> responsible annually for hundreds of
> indictments and trials.

Id. at 425-26.  Fourth, failure to afford absolute immunity to
prosecutors might undermine the functioning of the criminal
justice system because it might lead prosecutors concerned about
personal liability not to tender evidence that, while relevant,
might conceivably turn out to be fabricated by the witness.  Id.
at 426.  Fifth, failure to afford absolute immunity might weaken

20

the fairness of the criminal justice system by clouding postconviction review with "the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." Id. at 427. Finally, the court noted that absolute immunity for prosecutors would not leave the public without any means to punish or deter unconstitutional conduct because the availability of both judicial review and professional disciplinary procedures would protect the public and punish the errant prosecutor. Id. at 429. Thus, the Court concluded that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." Id. at 431.

In Burns v. Reed, 500 U.S. 478 (1991), and Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Court clarified the scope of a prosecutor's absolute immunity from suit under § 1983. In Burns, the Court held that a prosecutor was absolutely immune from liability for his presentation of evidence in a probable cause hearing but was not absolutely immune for the provision of legal advice to police officers investigating a case. Emphasizing its "functional approach" to immunity under § 1983, the Court reiterated that absolute immunity extends only to prosecutorial activities that are "intimately associated with the judicial phase of the criminal process." Burns, 500 U.S. at 493 (quoting Imbler, 424 U.S. at 430). Such activities include both the initiation and prosecution of the State's case and certain

"actions preliminary to the initiation of a prosecution" but nonetheless integral to the judicial prosecution of the case. Id. at 491 (quoting Imbler, 424 U.S. at 431 n.33).

In Buckley v. Fitzsimmons, the Court again declared that "the Imbler approach focuses on the conduct for which immunity is claimed," 509 U.S. at 271-72 (emphasis added), and the "functional tie" between that conduct and the judicial process in a criminal case. Id. at 277-78. It distinguished between a prosecutor's functioning as an "advocate" in judicial proceedings on behalf of the State, which is entitled to immunity, and as an investigator searching for clues that might lead to an arrest, which is not entitled to absolute immunity.

Applying the principles set forth in Butz, Imbler, and their progeny to the instant case, we hold that the CYS defendants are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings. Their immunity is broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings. We reach this conclusion because (1) the functions performed by the CYS defendants in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect

22

citizens from unconstitutional actions by child welfare workers. With this holding, we join the courts of appeals of the Fourth, Sixth, Seventh, Eighth, and Ninth Circuits. <u>See</u>, <u>e.g.</u>, <u>Millspaugh v. County Dep't of Pub. Welfare of Wabash County</u>, 937 F.2d 1172, 1176 (7th Cir. 1991); <u>Vosburg v. Department of Soc. Servs.</u>, 884 F.2d 133, 135 (4th Cir. 1989); <u>Salyer v. Patrick</u>, 874 F.2d 374, 378 (6th Cir. 1989); <u>Meyers v. Contra Costa County Dep't of Soc. Servs.</u>, 812 F.2d 1154, 1156 (9th Cir. 1987).[6]

The functions performed by child welfare workers like the CYS defendants in dependency proceedings are closely

---

6. Justices Thomas and Scalia recently criticized the appellate court cases that have held that social workers are entitled to absolute immunity for quasi–prosecutorial acts on the ground that

> [a]n official seeking ... immunity ... must at the outset show that a "counterpart to the privilege he asserts" was recognized at common law in 1871....  The courts that have accorded absolute immunity to social workers appear to have overlooked the necessary historical inquiry; none has seriously considered whether social workers enjoyed absolute immunity for their official duties in 1871.  If they did not, absolute immunity is unavailable to social workers under § 1983.  This all assumes, of course, that "social workers" (at least as we now understand the term) even existed in 1871.  If that assumption is false, the argument for granting absolute immunity becomes (at least) more difficult to maintain.

<u>Hoffman v. Harris</u>, 114 S. Ct. 1631 (1994) (Thomas, J., dissenting from denial of certiorari) (citations omitted).  However, there has been no indication that the other justices on the Court perceive the appropriate historical inquiry in the same way as do Justices Thomas and Scalia.  Indeed, it seems to us inconsistent with the Court's holding in <u>Butz</u> to do so.

analogous to those performed by prosecutors.  As the Ninth

Circuit has explained,

[a]lthough child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor.  The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children.

Meyers, 812 F.2d at 1157.

In addition, child welfare workers involved in the

prosecution of dependency proceedings clearly serve "as advocate

for the State," Imbler, 424 U.S. at 430–31 n.33, in a capacity

that is "intimately associated with the judicial phase of  the

[child protection] process."  Id. at 430.  A CYS court liaison

officer and a case work supervisor  testified that CYS

caseworkers, after consultation with their supervisors and other

professionals such as psychologists and school officials,

determine what recommendations are made to the court in

dependency proceedings.  Even when they work with an attorney who

represents CYS in the dependency proceeding, the attorney plays

no role in formulating the recommendations made to the court; she

merely "expresses [CYS's] recommendations on [its] behalf."  App.

at 518a.  Because CYS caseworkers are directly responsible for

the recommendations made to the court in dependency proceedings,

their actions in determining those recommendations and

24

communicating them to the court are "intimately associated" with the judicial process in much the same way as are a prosecutor's actions in representing the state in criminal prosecutions.

Moreover, we conclude that the public policy considerations supporting absolute immunity for prosecutors are equally applicable to child welfare workers acting in a quasi-prosecutorial capacity in dependency proceedings. Like a prosecutor, a child welfare worker must exercise independent judgment in deciding whether or not to bring a child dependency proceeding, and such judgment would likely be compromised if the worker faced the threat of personal liability for every mistake in judgment. Certainly, we want our child welfare workers to exercise care in deciding to interfere in parent-child relationships. But we do not want them to be so overly cautious, out of fear of personal liability, that they fail to intervene in situations in which children are in danger. See Millspaugh, 937 F.2d at 1176-77; cf. DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 191-93 (1989).

In the absence of absolute immunity, we would expect suits in retaliation for the initiation of dependency proceedings to occur with even greater frequency than suits against prosecutors. Parents involved in seemingly unjustified dependency proceedings are likely to be even more resentful of state interference in the usually sacrosanct parent-child relationship than are defendants of criminal prosecution. See Vosburg, 884 F.2d at 137. In turn, the likely frequency of such

25

suits would result in a significant diversion of the energies of child welfare workers away from their official duties to the defense of § 1983 litigation.  Further, defending against § 1983 actions would likely be as difficult for child welfare workers as it would be for prosecutors because child welfare workers, like prosecutors, must make quick decisions on the basis of limited information.  "Defending these decisions, often years after they are made, could impose unique and intolerable burdens on [child welfare workers] responsible annually for hundreds of [dependency and child abuse cases]."  Imbler, 424 U.S. at 425–26.

Finally, as with prosecutors, there are alternative mechanisms other than the threat of § 1983 liability that protect the public against unconstitutional conduct by child welfare workers.  First, the judicial process itself provides significant protection.  See Millspaugh, 937 F.2d at 1177.  Child welfare workers must seek an adjudication of dependency from a neutral judge whose decisions are guided by the "best interests of the child" and subject to appellate review.  Second, although child welfare workers are not subject to the comprehensive system of professional responsibility applicable to prosecutors, they are under the supervision of the agency that employs them.  The agency has an incentive to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom.

Reviewing Ernst's Third Amended Complaint, it is clear that all of the claims against the CYS defendants concern actions taken by the defendants in connection with the formulation and presentation of recommendations to the state court regarding Susanne's dependency status and disposition. Because all of these actions are analogous to a prosecutor's preparation for and initiation and presentation of a criminal prosecution, we hold that the CYS defendants are entitled to absolute immunity for the conduct that Ernst challenges here.[7]

We cannot agree with the district court's conclusion that the CYS defendants' actions in preparing and formulating recommendations to the state court were not within the scope of their absolute immunity. The Supreme Court has explicitly rejected the idea that absolute prosecutorial immunity "extends only to the act of initiation itself and to conduct occurring in

---

7. We emphasize that our holding concerns only actions taken by child welfare workers in the context of dependency proceedings. Like our sister courts in the Fifth, Sixth, Seventh, and Tenth Circuits, we would be unwilling to accord absolute immunity to "investigative or administrative" actions taken by child welfare workers outside the context of a judicial proceeding. See Snell v. Tunnell, 920 F.2d 673 (10th Cir. 1990) (holding that pre-adjudicatory investigative activities by child welfare workers are entitled only to qualified immunity); Achterhof v. Selvaggio, 886 F.2d 826 (6th Cir. 1989) (holding that opening and investigating child abuse case and placing parent's name on central registry of abusers are investigative and administrative activities entitled only to qualified immunity); Austin v. Borel, 830 F.2d 1356 (5th Cir. 1987) (holding that filing of complaint that allowed child services to obtain custody but did not initiate adjudicative proceeding was analogous to police officer's complaint filed to obtain arrest warrant and was therefore entitled only to qualified immunity) (citing Malley v. Briggs, 475 U.S. 335 (1986)); Millspaugh v. County Dep't of Pub. Welfare of Wabash County, 937 F.2d 1172 (7th Cir. 1991) (same).

27

the courtroom." Buckley, 509 U.S. at 272. Moreover, the Court

has expressly embraced the idea that immunity must be afforded to

the evaluation of available data to determine whether and in what

manner to seek judicial action:

> We expressly stated [in Imbler] that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," and are nonetheless entitled to absolute immunity.... We have not retreated ... from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

Id. at 272-73.

Ernst here challenges the CYS defendants' formulation

of professional judgments that served as the basis for a series

of recommendations they made to the Pennsylvania Court of Common

Pleas. To grant them absolute immunity for the recommendations

they made to the court but deny them such immunity for the

observations and judgments that were the necessary predicate for

those recommendations would eviscerate the immunity they did

receive and undermine the purposes sought to be advanced by the

grant of absolute immunity. We therefore conclude that, like a

prosecutor's evaluation of evidence in preparation for indictment

or trial, the CYS defendants' gathering and evaluation of

28

information and professional opinions regarding the relationship between Ernst and Susanne in preparation for the dependency proceedings must be protected. Accordingly, we will affirm the grant of judgment for the CYS defendants' for their actions in formulating recommendations concerning Susanne's dependency proceedings on the ground of absolute immunity rather than the substantive due process analysis relied on by the district court.

## B.  Liability of CYS

The district court granted judgment in favor of CYS because it found that Ernst had failed to prove at trial that CYS had a policy or custom of allowing its employees to violate substantive due process or of inadequate training, supervision, or discipline of its employees in that regard. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978) (holding that municipality cannot be held liable for constitutional violations committed by employees unless such violations occurred pursuant to a policy or custom promulgated by the municipality). Ernst does not argue on appeal that this finding was clearly erroneous. Instead, she contends that the district court erred when it failed to consider evidence that CYS was liable under § 1983 on the theory that substantive due process violations were committed by an official with policy-making authority. We find that the district court did not err in refusing to consider the proffered "evidence."

29

During the bench trial, Ernst attempted to prove that CYS had a policy or custom of violating the substantive due process rights of the families with which it was involved by calling several witnesses to testify about their dissatisfaction with CYS's handling of their cases. After the record had been closed and the parties had offered closing argument, Ernst's counsel, perhaps realizing that the testimony then in evidence would not suffice to prove a "policy or custom" of unconstitutional conduct by CYS, urged the court to also consider the possibility that CYS was liable under § 1983 for substantive due process violations committed by a CYS official with policy-making authority. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986) (holding that municipality may be liable under § 1983 for constitutional deprivation that occurs because of a single action taken by an official with final decision-making authority to take such action). As proof of such unconstitutional conduct by a CYS policy-maker, Ernst's counsel directed the court to an affidavit by Wayne Stevenson, the director of CYS, that had been submitted with CYS's motion for summary judgment. According to the affidavit, Stevenson was familiar with and had approved of the handling of the Ernst case. However, Stevenson had not been called to testify during the trial nor had the affidavit been offered into evidence. Accordingly, the district court ruled that it would not consider the contents of the affidavit in determining whether CYS was liable under § 1983.

30

Ernst argues on appeal that the district court erred in failing to take judicial notice of the affidavit as a judicial record in the case. See Fed. R. Evid. 201 (court shall, at any stage of a proceeding, take judicial notice, upon request by a party, of a fact not subject to reasonable dispute because it is generally known or is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., 533 F.2d 510, 521 (10th Cir. 1976) ("the court may take judicial notice of its own records, especially in the same case"); McCormick on Evidence § 330, at 396 (4th ed. 1992). Ernst acknowledges that the doctrine of judicial notice only permits the court to take notice of the fact of the submission of the affidavit. Nonetheless, she argues that the contents of the affidavit are themselves admissible for their truth under Fed. R. Evid. 801(d)(2), which provides that a statement made by and offered against a party is not hearsay.

We find no reversible error. The fact that the statements contained in the Stevenson affidavit may not be hearsay says nothing about whether the court erred in refusing to consider the substance of the statements when the contents of the affidavit were never offered into evidence during the trial. While the district court undoubtedly had the authority to reopen the record, it is apparent that it did not abuse its discretion in declining to do so. We hold, therefore, that the district court did not err in refusing to consider the Stevenson affidavit

31

as evidence of CYS's liability under § 1983, and we will affirm the grant of judgment for CYS.

### C. The First Amendment Challenge to
### Juvenile Court Closure Provision

Pennsylvania's Juvenile Act provides in relevant part:

> Except in hearings to declare a person in contempt of court and in [delinquency] hearings as specified in subsection (e), the general public shall be excluded from hearings under this chapter. Only the parties, their counsel, witnesses, the victim and counsel for the victim, other persons accompanying a party or a victim for his or her assistance, and any other person as the court finds have [sic] a proper interest in the proceedings or in the work of the court shall be admitted by the court....

42 Pa. C.S.A. § 6336(d). The Official Comment to the section states that "[t]he section as drawn permits the court in its discretion to admit news reporters. This is frequently done with the understanding that the identity of the cases observed will not be published, a procedure generally satisfactory to the news media."

Ernst argued before the district court that this closure provision violated the First Amendment right of access to judicial proceedings enjoyed by the public and press. The district court declined to address Ernst's First Amendment claim because it found that Ernst lacked standing to raise the constitutional rights of the public and press. On appeal, Ernst argues that the district court erred in refusing to permit her to

raise the right of access of the public because she is a member of the public entitled to raise the right on her own behalf.

Although we agree that Ernst shares the public's right of access to the courts, we nonetheless hold that the district court was correct in concluding that Ernst lacked standing to bring her First Amendment claim. We reach this conclusion because even though Ernst, along with the rest of the public, possesses a general right of access to the courts, she has not alleged or shown that she suffered the injury-in-fact necessary to create a justiciable "case or controversy" under Article III of the Constitution.

The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To satisfy the standing requirement, a plaintiff must demonstrate (1) an "injury in fact" which is both "concrete and particularized" and "actual or imminent"; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. Id. at 560-61. The "injury in fact" component requires that the plaintiff "allege a distinct and palpable injury to himself." Warth v. Seldin, 422 U.S. 490, 501 (1975). The injury must "affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1.

A generalized injury shared by the plaintiff with the public at large is insufficient to create a concrete "case or

controversy" over which a federal court may exercise its jurisdiction. Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 219-20 (1974). As the Court explained in Schlesinger,

> [S]tanding to sue may not be predicated upon an interest of the kind ... which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding the grievance.... Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions.... [T]he requirement of concrete injury further serves the function of insuring that [constitutional] adjudication does not take place unnecessarily.

Id. at 220-21.

Here, Ernst failed to allege the kind of concrete and particularized injury necessary to establish standing to assert a First Amendment challenge to Pennsylvania's juvenile court closure provision. She has not alleged that she has ever been excluded under the closure provision from a proceeding to which she sought access. The only First Amendment allegation in her Third Amended Complaint asserts that "Sylvia Ernst's first

34

amendment rights are being violated by not opening up the record of this case; courts are closed to press." Compl. ¶ 64. During argument before the district court on the First Amendment issue, Ernst's counsel agreed with the court that Ernst was "not complaining about her exclusion from a particular hearing but ... about the unconstitutionality of the statute because all the proceedings are closed to the press and public." App. at 872a (emphasis added).

Because Ernst has alleged only a generalized harm to the public at large from the closure provision, we hold that she lacks standing to assert a First Amendment challenge to the provision.

IV.  Borzillo's Cross-Appeal

Ernst's only success at trial was against CYS attorney Borzillo, against whom she was awarded nominal damages and attorneys' fees.  The district court found that Borzillo violated Ernst's right to substantive due process when she filed a petition for rehearing en banc with the President Judge of the Chester County Court of Common Pleas and obtained a stay of a court order granting Ernst an unsupervised visit with Susanne.  Borzillo cross-appeals the district court's grant of judgment against her, arguing, inter alia, that she is entitled to absolute immunity for her activity in connection with the petition.

In its pre-trial grant of partial summary judgment for the defendants, the district court held that Borzillo was entitled to absolute quasi-prosecutorial immunity for her actions in representing CYS in connection with Susanne's dependency proceedings.[8]  However, the court held that Borzillo was not

---

8.  Although Borzillo does not exercise independent judgment in determining what specific recommendations are made to the court regarding the appropriate disposition of a dependent child, see supra, p. 22, she exercises independent judgment in offering legal advice to CYS on such issues as, for example, whether there is sufficient evidence to pursue a dependency adjudication. Moreover, in representing CYS before the court, Borzillo clearly acts as an advocate on behalf of the state in a role that is "intimately associated" with the judicial process.  Thus, her duties, like those of the CYS defendants, are closely analogous to those of a prosecutor advocating on behalf of the state in a criminal prosecution.  Accordingly, for reasons similar to those set forth in Part III-A, we agree with the district court that Borzillo is entitled to absolute immunity for her representation of CYS.

immune for actions she took on CYS's behalf after Judge Melody of the Chester County Court of Common Pleas removed her from Susanne's case.

Borzillo's removal from Susanne's case arose from an exchange she had with the court during a November 20, 1991 hearing before Judge Melody, who was then newly assigned to the case. During the hearing, but outside the presence of CYS or its attorney, Judge Melody spoke with Susanne about her desire to have an unmonitored weekend home visit with her grandmother. Upon learning that the court was considering granting a home visit, Borzillo returned to the courtroom to "object strenuously." In the apparent belief that Judge Melody was on the verge of granting the home visit, Borzillo commented, "Your Honor, I find it interesting that you are making a decision without reading the file of this case." App. at 2075a-76a. The following exchange ensued:

THE COURT: I didn't make any decision. I'm disturbed with you, Ms. Borzillo. You are saying that I'm making decisions and I haven't made any decision. I am talking to people and I resent the fact that you are saying that I am making decisions. I haven't made any decision yet, --

MS. BORZILLO: I am sorry, Your Honor.

* * *

THE COURT: Ms. Borzillo, I observed the way you acted. You did not act as a professional attorney. You came in with an obvious bent and chip on your shoulder with your face . . . red as a beet, red as a tomato, mad, distraught, upset. You did not act as a responsible attorney, in my humble opinion. I do not think that you can possibly be objective with regard to this case and the

37

attorney involved for CYS has to be objective and because you cannot be objective and because of what you demonstrated to me, you cannot help us with regard to this case, and by that I mean, you cannot help the Court and I don't believe that you can help in the best interest of this child. So in the best interest of this child, you are going to be removed from this case and someone else is going to have to become involved in the case. In the meantime, all matters are continued until that is done.

* * *

MR. WILSON [Susanne's court-appointed attorney]: Your Honor, may I ask that she remain in the case.

THE COURT: We will not have a meeting at this time until CYS is represented. So, we will have CYS represented by someone and then I would be happy to have a meeting with you and other counsel.

MR. WILSON: I would ask that you reconsider Ms. Borzillo's removal from the case.

THE COURT: I am not going to reconsider it. It was so obvious in the way that she stormed into this room, that she cannot be objective. I have been a lawyer since 1960, I have been a Judge since May of 1981, I know people, I know lawyers, and it's obvious to me that the way that she stormed in here with her face as red as a beet or red as a tomato, that she cannot be objective with regard to this case and she cannot, in my humble opinion, to aid me as a Judge and in my humble opinion, she cannot be objective, which would be in the best interest of the child and that's why in my opinion she should no longer remain in the case. Because of the way that she acted, it's too obvious to me that new blood, by way of a new attorney for CYS, has to be infused in this case.

MR WILSON: Your Honor will not reconsider?

THE COURT: I will not reconsider. It's too obvious to me that she is too personally involved in this case to the extent -- well, you saw the way she acted and I don't have to

38

> say anymore, so that will take care of things
> for today.

Transcript of November 21, 1991 Hearing, at 34-37, App. at 2076a-78a & Supp. App. at 1.

Judge Melody did not immediately issue an order implementing his declared intention to remove Borzillo and to require CYS to retain new counsel. Moreover, contrary to his statement that all matters would be continued until a new attorney was appointed by CYS, Judge Melody issued an order on December 13, 1991 granting Ernst a one hour unsupervised visit with Susanne. Upon receiving a copy of the order from Ernst's attorney on December 18, 1991, CYS asked Borzillo to look into the matter and try to prevent the unsupervised visit from taking place.

Borzillo contacted Judge Melody's chambers at 11:05 A.M. to challenge the issuance of the order and was informed that the judge would not be available to entertain a motion for reconsideration until December 23rd. Judge Melody did, however, send Borzillo a letter, dated December 18, 1991, threatening contempt proceedings if CYS did not comply with the visitation order, and further stating, "As of this moment, you are not counsel for Children & Youth Services in this case. However, you may be reinstated in the future for Children & Youth Services in this case." In his letter, Judge Melody acknowledged that he had "handed down the order sua sponte without input from Children & Youth Services or anyone else because [he] believed it was in the

39

best interest of the child to do so."  The letter indicated that a copy had been dispatched to President Judge Lawrence Wood of the Chester County Court of Common Pleas.

Continuing her efforts to prevent the unmonitored visit from taking place, Borzillo, on December 18, 1991, filed with President Judge Wood a motion for argument en banc and a motion to stay Judge Melody's visitation order.  Judge Wood granted a stay at 9:21 A.M. the next day, and Ernst's visit with Susanne that afternoon was supervised.  Shortly thereafter, Judge Melody withdrew from the case, it was reassigned, and the new judge allowed Borzillo to continue representing CYS.

The district court held that Borzillo was not entitled to immunity for actions taken during the time that she was "removed" from the case because those actions were "in breach of a court order" and as such were "not within the prosecutorial function."  Ernst v. Children & Youth Servs. of Chester County, No. CIV. A. 91–3735, 1993 WL 343375, at *24 (E.D. Pa. Sept. 3, 1993) (citing Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare, 925 F.2d 844 (5th Cir. 1991)).  On the merits, the court found that Borzillo's efforts to prevent Ernst from enjoying a single unsupervised visit with Susanne were "motivated by animosity and anger at Ernst's small victory" and "exceeded the bounds of zealous advocacy."  Id. at *25.  Because we conclude that Borzillo was not acting completely outside her authority as CYS's attorney, we reject the district court's conclusion and

40

hold that Borzillo is entitled to absolute immunity for her actions taken on CYS's behalf on December 18-19, 1991.

As we explained in Part III-A, a prosecutor or other official performing a quasi-prosecutorial function for the state is entitled to absolute immunity for official actions taken on behalf of the State that are integrally related to the judicial process. If absolute immunity is to serve its purpose, the line between official conduct, as to which there is immunity, and extra-official conduct, as to which there is not, must be drawn without reference to the official's subjective state of mind. It must also be drawn in a manner that leaves officials room for good faith mistakes about the extent of their authority. Thus, if the circumstances in a particular case were such that a reasonable prosecutor in the defendant's position could have had a good faith belief that he was authorized by his office to act as he did, immunity will be recognized. In such a case, an allegation that the official acted in bad faith, knowing his conduct to be unauthorized, will not strip the official of absolute immunity. Similarly, absolute immunity will be available, in such a case, even if the authority in fact was lacking under the law. Stated conversely, immunity will be denied only for those acts which a reasonable prosecutor would recognize as being "clearly outside his jurisdiction" to represent the state before the court. Bauers v. Heisel, 361 F.2d 581, 591 (3d Cir. 1966).

41

Bauers illustrates the governing principles.  It was a
civil rights action in which the defendant prosecutor had
instituted and prosecuted a criminal proceeding against the
plaintiff in a New Jersey court of general jurisdiction.  A
higher New Jersey court subsequently held that because the
defendant had been under 18 years of age at the time of the
alleged offense, jurisdiction was lodged exclusively in the
Juvenile Court.  Accordingly, the indictment, sentence and
ensuing incarceration were found to be illegal.  The plaintiff
alleged that the defendant knew that plaintiff had not reached
the age of 18 at the time of the alleged crimes and, accordingly,
that the prosecution would deny plaintiff due process of law.  We
accepted both this allegation and the legal proposition that the
prosecution had been beyond the defendant's authority.  We
nevertheless held that the defendant was entitled to absolute
immunity based on the following rationale:

> We have already indicated that the primary
> responsibility of a prosecutor is to
> vindicate the wrongs which have been
> committed against society.  This is precisely
> what appellee was doing when the denial of
> appellant's liberty occurred.  The mere fact
> that the New Jersey Legislature had excised
> from his responsibility the prosecution of
> individuals who were under the age of
> eighteen when they committed acts which would
> otherwise be punishable offenses does not
> indicate that he was acting clearly outside
> his jurisdiction.

Bauers, 361 F.2d at 591; see also Snell v. Tunnell, 920 F.2d 673,
694 (10th Cir. 1990) ("[w]hile a prosecutor might lose absolute

42

immunity when he acts with a complete and clear absence of authority, such a condition does not occur when a prosecutor has an arguable basis of authority").

With this background, we turn to the facts of this case. Borzillo was an attorney in private practice who was engaged by CYS from time to time to represent it in dependency proceedings. By December 18, 1991, her representation of CYS in Susanne's dependency matters was entering its 43rd month. During that representation, there had been countless appearances before the court and, by December 18, 1991, the relevant factual background of the matter could fairly be characterized as extensive.

As we have noted, the act which the district court found to be beyond the scope of Borzillo's absolute immunity was the filing in court on December 18th of a petition seeking review of an order entered without notice to her client. The petition was filed at her client's request and did nothing more than present to the court the views and position of her client with respect to that order. Thus, like the challenged conduct of the prosecutor in Bauer, the conduct Ernst challenged here was precisely the kind of activity in which one occupying Borzillo's office would be expected to engage.

It is true that Ernst alleged, and the court found, that Borzillo and her client filed this petition because of hostility to Ernst rather than for the purpose of serving the best interest of Susanne. As we have explained, however, the

43

subjective motivation behind the challenged action cannot deprive Borzillo of immunity if a reasonable person in her position could have believed she was acting within the scope of her authority.

The district court also concluded that the filing of the petition was "in breach of a court order." Ernst, 1993 WL 343375, at *24. While we agree that the existence of a court order directing that the challenged act not be done is highly relevant to, and will ordinarily be determinative of, whether a prosecuting attorney has acted in a "clear absence of authority," there were extenuating circumstances here.

At the November 20, 1991, hearing before the court, Judge Melody, after an emotionally charged exchange, concluded that Borzillo could not be "objective" about the case. The judge then announced that Borzillo would be removed and that someone else would have to become involved in the case. He assured the parties that "in the meantime, all matters [would be] continued until that was done." No order followed directing CYS to secure new counsel. Given the nature, length and frequency of the proceedings in this matter, a change of counsel was not something that CYS could easily accomplish. In light of this fact and the emotional character of the November 20th hearing, we believe CYS cannot be faulted for waiting to see if an order requiring a change of counsel would actually ensue.

From CYS's perspective, matters remained in a holding pattern until the morning of December 18th when it received from Ernst's counsel a copy of an order directing that an unsupervised

44

visit take place the next day.  This order came as a complete surprise since CYS had received no notice that an application for this relief had been filed.  It believed that such a visit was not in Susanne's interest and asked Borzillo to see what could be done.  Borzillo first tried to convey her client's view to Judge Melody.  When advised that Judge Melody was unavailable, Borzillo filed the challenged petition for rehearing en banc and a stay.

The "order" removing Borzillo to which the district court referred in its ruling may have been in the letter apparently written by Judge Melody during the afternoon of December 18th in which he informed Borzillo that she was removed from the case "as of this moment."  The district court made no express finding, however, that this letter was received by Borzillo prior to the filing of the challenged petition, and we have found no record evidence that would support such a finding.  Nonetheless, even if we were to assume that Judge Melody's letter was hand-delivered to Borzillo prior to the filing of the petition, we could not say that the petition she filed was clearly in excess of her authority.

Borzillo's client had had no previous opportunity to express its views on Ernst's application.  Nor had it previously had the opportunity to challenge Judge Melody's December 18th letter order removing its counsel from the case, presumably for lack of objectivity.  There was clearly no time to secure substitute counsel; the order that CYS wished to challenge would

45

become moot before new counsel could review the matter and file a petition.

Judge Melody's December 18th letter order "removing" Borzillo was not entered for the benefit or protection of an opposing party. Nor was it entered as a sanction for conduct the judge had found to be disruptive of the judicial process. Rather, it was entered presumably because the judge believed Borzillo would not, at least for the moment, be able to assist him in determining what was in Susanne's best interest.

In this context, we believe a reasonable attorney in Borzillo's position could have concluded that she owed a duty to her client to seek judicial review at its behest and that petitioning for that review before the court en banc was not what Judge Melody intended to preclude by writing his December 18th letter. It necessarily follows that Borzillo did not act in a clear absence of authority.[9]

---

9. In the course of reaching its contrary conclusion, the district court suggested that Borzillo improperly failed to disclose to Judge Wood the fact that Judge Melody had removed her from the case. The basis for this suggestion is not clear to us, but, in any event, it does not alter our conclusion that Borzillo did not act in clear absence of authority. If Borzillo did not receive Judge Melody's December 18th letter before she filed her petition on that day, we believe the "removal" situation was sufficiently ambiguous that a disclosure on the subject was not required. Even if Borzillo received Judge Melody's letter before her filing with Judge Wood, we believe, as we have explained, that a reasonable attorney in Borzillo's position reasonably could have believed that seeking review before another judge was not something Judge Melody intended to preclude. Moreover, if Borzillo received Judge Melody's letter before filing, she would have known from the face of the letter that a copy had been dispatched to Judge Wood.

46

Because we hold that Borzillo is entitled to absolute immunity for all of her quasi-prosecutorial activities while representing CYS in connection with Susanne's dependency proceedings, we will reverse the district court's grant of judgment against her and remand for entry of judgment in her favor.

V.

The district court found it "disappointing that [the CYS] professionals were unable to submerge their personal views in dealing with a difficult woman or to give her sufficient credit for fighting placements out of genuine concern for [Susanne's] welfare." Ernst, 1993 WL 343375, at *23. There is ample evidence in the record to support this view, as well as the view that their inability to do so had unfortunate consequences for Susanne and her grandmother. Nevertheless, we must acknowledge, as did the district court, the interest of the state in ensuring the independent and effective operation of the agency charged with protecting the state's children. That overriding interest precludes this court from affording Ernst compensation for whatever injuries she may have suffered at the hands of CYS. We will affirm the district court's grant of judgment in favor of CYS and the CYS defendants. We will reverse the grant of judgment in favor of Ernst against Borzillo and remand for entry of judgment in favor of Borzillo.

47