[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 2, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-14476

_____

D.C. Docket No. 97-03585-CV-CC-1

KIM GOODMAN, on her own behalf and on
behalf of her minor child, MICHAEL GOODMAN,

Plaintiff-Appellant,

versus

PATRICIA SIPOS and D'ANNA LIBER,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 2, 2001)**

Before CARNES, COX and NOONAN[*], Circuit Judges.

CARNES, Circuit Judge:

_____

[*]Honorable John T. Noonan, Jr., U.S. Circuit Judge for the Ninth Circuit, sitting by
designation.

Plaintiff Kim Goodman ("Goodman"), on her own behalf and on behalf of her son Michael Goodman ("Michael"), brought this action pursuant to 42 U.S.C. § 1983 against Defendants Patricia Sipos and D'Anna Liber, employees of the Georgia Department of Family and Children Services ("DFCS"), seeking damages for alleged violations of their constitutional rights in connection with the investigation and initiation of a state juvenile proceeding to remove Michael from Goodman's custody. The district court found that the plaintiffs were "essentially challenging" the order issued by a Georgia state juvenile court removing Michael from Goodman's custody, and held that the lawsuit was barred under the Rooker - Feldman doctrine. We agree with respect to some of the plaintiffs' claims, but do not agree that all of the claims were so "inextricably intertwined" with the state court order as to be barred. As a result, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

### A. FACTS

This lawsuit arises out of an investigation of child neglect conducted by DFCS against Goodman. Defendant D'Anna Liber was the Supervisor of the Child Services Investigation Section of the Cobb County DFCS Office in 1995 when this investigation took place. On October 27, 1995, Liber received a call

2

from school personnel informing her of a report from one of Goodman's neighbors that Goodman left Michael, age 13 at the time, at home alone all day from 7 a.m. until 10 or 11 p.m., and that Michael asked neighbors for food. The school official further informed Liber that Goodman had previously withdrawn Michael from school, indicating that she would home-school him.

In response to this report, a caseworker visited Goodman's home and reported that Michael was barefoot, and that he admitted he was at home alone four days a week until after 10:30 p.m. while his mother worked and went to school. He indicated that they had more food now that his mother was working. Goodman later called Liber and stated that she was complying with home-schooling regulations, but she refused to meet with any DFCS officials.

On November 9, 1995, Liber received an anonymous call from a neighbor of Goodman. The neighbor again stated that Michael was at home alone, both during the day and at night. About two weeks later, DFCS received a third report from another neighbor stating similar concerns.[1] The person making the third report stated that Michael begged for food, was not clean, walked barefoot in a yard with 20 chickens, and lived in a house with about 50 birds. That person also said he and

---

[1] The record does not indicate whether this neighbor was the same one who made the report about Michael on October 27, 1995 or who made the anonymous report on November 9, 1995.

3

other neighbors were concerned about Michael and that Goodman was "a little crazy." Liber assigned Defendant Patty Sipos, a DFCS caseworker, to investigate the reports.

After being assigned to the case, Sipos went to Goodman's house and knocked on the door, but no one answered. Sipos called Liber and informed her of this, and Liber decided that police involvement was necessary. Liber called the child abuse unit of the Cobb County Police Department and informed them of the situation, and two uniformed officers were sent to the house to meet Sipos. Officers Forrester and Crook came to the house, discussed the situation with Sipos, and then knocked on the door. The subsequent events are in dispute.

According to Michael, Officer Forrester opened the unlocked door and stood at the threshold with Sipos behind him. According to the defendants, the officers explained to Michael why they were there, and asked him to call his mother so that they could meet with her. After several minutes of discussion and unsuccessful attempts to reach Goodman, the defendants state that Michael opened the door wide and gestured for the officers and Sipos to enter. Goodman and Michael deny that he consented (or had authority to consent) for the officers or Sipos to enter.

Sipos states that her purpose in entering was to determine whether the house posed a health hazard to Michael (because of the report of birds) and to determine

4

whether there was food for him. According to the defendants, Sipos and the officers quickly walked through the house, while Michael laughed and joked with the officers. Sipos and the officers departed after Sipos concluded that the house was not a health risk and that there was food.

Sipos returned later in the day in an attempt to speak with Goodman, but no one was home. She then returned the next day and spoke with a neighbor who expressed concerns about Michael's being at home alone all day and his begging for food.[2] Sipos later called Goodman at work after getting no answer at home, but Goodman hung up on her.

On December 5, 1995, a confidential source claiming to be a long-time friend of Goodman reported to Sipos that Goodman had threatened to shoot herself and Michael. The caller said that Goodman was acting bizarre, and had said that she had a gun. The caller seemed to Sipos to be reliable. Thereafter, Sipos spoke with Robert Grayson, an attorney for DFCS, about the situation. Grayson spoke with the confidential source and concluded based on that conversation that there was sufficient evidence to seek an ex parte order taking custody of Michael away from Goodman.

---

[2]The record is also unclear as to whether this neighbor was responsible for one or more of the previous reports to DFCS about Michael.

The next day, DFCS filed an ex parte petition, supported by an affidavit from Sipos, seeking to obtain custody of Michael. The petition and supporting affidavit stated that Michael was deprived because his mother had withdrawn him from school without complying with home school requirements. They indicated that DFCS had received several reports of Michael being home alone all day, and a report that Goodman had threatened to shoot herself and Michael. Finally, the petition and affidavit stated that Goodman had been uncooperative with DFCS during its investigation, and that Michael should be removed from his mother's custody for his own safety. Goodman alleges that Sipos' affidavit filed in support of the petition for custody was intentionally or recklessly false.

After reviewing DFCS' ex parte petition, the Cobb County juvenile court issued an order taking custody away from Goodman and setting a hearing for the following day. Michael was then picked up by the sheriff's department.

The following day, the juvenile court held a hearing which Goodman attended. The court found probable cause to grant DFCS custody of Michael, and DFCS and Goodman agreed that Michael would be placed with a family friend, Curtis Scott. A few days later, DFCS took Michael away from Scott, however, because Sipos claimed that Scott had deprived her of access to Michael. According to Goodman, Sipos threatened to have Scott arrested if he did not return

Michael. At that time Michael was placed in a shelter. Goodman filed a motion with the juvenile court to have Michael returned to Scott's custody, but after a hearing the court denied her motion. The parties eventually agreed that Robert Goodman, Michael's father, would be granted temporary custody of him. On April 12, 1996, the juvenile court entered an order requiring that Michael remain in his father's custody for up to two years.

## B. PROCEDURAL HISTORY

In their complaint, the plaintiffs raise three § 1983 claims that are based on allegations of separate constitutional violations. First, they allege that Liber, Sipos and Officer Forrester violated their Fourth Amendment rights by unlawfully entering and searching Goodman's house without a warrant or consent.[3] Second, the plaintiffs challenge the veracity of the affidavit submitted by Sipos to the juvenile court in support of the ex parte petition for custody of Michael, and argue that it and the ensuing ex parte proceeding violated the Due Process Clause of the Fourteenth Amendment. Finally, the plaintiffs allege that the defendants committed an additional due process violation by threatening Scott with arrest if he

---

[3]After the district court denied Officer Forrester's motion for summary judgment on qualified immunity grounds, the plaintiffs settled the claims against him. Therefore, he is not a party to this appeal.

7

did not return Michael to DFCS.[4]

Following extensive discovery, the defendants moved for summary judgment based on the <u>Rooker-Feldman</u> doctrine and qualified immunity.[5] The district court granted summary judgment in favor of Sipos and Liber based on the <u>Rooker-Feldman</u> doctrine, reasoning that:

> Notwithstanding the fact that plaintiffs frame much of defendants' conduct in terms of alleged constitutional deprivations, by attacking the veracity of certain pieces of evidence and the manner in which certain evidence was obtained, plaintiffs are essentially challenging the basis of the Juvenile Court of Cobb County, Georgia's decision to remove Michael Goodman from . . . [Kim] Goodman's custody.

## II. DISCUSSION

The only issue that we address is whether the district court correctly determined that it had no subject matter jurisdiction over the plaintiffs' claims in light of the <u>Rooker-Feldman</u> doctrine.[6] "We review questions of subject matter

---

[4]The complaint also states a fourth claim alleging that Michael was provided with inadequate medical attention while in DFCS' custody. However, the plaintiffs conceded at oral argument that claim does not relate to Sipos or Liber and is not at issue in this appeal.

[5]Although the defendants invite us to consider their qualified and/or absolute quasi-prosecutorial immunity claims in the event that we disagree that the <u>Rooker-Feldman</u> doctrine applies, we decline to exercise our discretion do so. The district court did not address whether either basis for immunity applies, and we believe that allowing the district court to address those issues in the first instance is preferable under the circumstances of this case.

[6]The parties disagree about the proper procedural vehicle for a district court to use in addressing subject matter jurisdiction. Instead of dismissing the complaint for lack of subject matter jurisdiction, the district court granted summary judgment based on lack of subject matter jurisdiction. The defendants maintain that was the correct approach, but the plaintiffs contend

jurisdiction <u>de</u> <u>novo</u>." <u>Singleton v. Apfel</u>, 231 F.3d 853, 856 (11th Cir. 2000). For the reasons explained below, we conclude that the district court lacked subject matter jurisdiction on two of the plaintiffs' three claims.

The <u>Rooker-Feldman</u> doctrine places limits on the subject matter jurisdiction of federal district courts and courts of appeal over certain matters related to previous state court litigation. <u>See</u> <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 415-16, 44 S. Ct. 149, 150 (1923); <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 476-82, 103 S. Ct. 1303, 1311-15 (1983). We have

---

that dismissal, instead of summary judgment, is the proper procedure for disposing of a case when there is a lack of subject matter jurisdiction. They argue that subject matter jurisdiction cannot be determined based on anything beyond the allegations of the complaint.

A federal court must always dismiss a case upon determining that it lacks subject matter jurisdiction, regardless of the stage of the proceedings, and facts outside of the pleadings may be considered as part of that determination. <u>See</u>, <u>e.g.</u>, <u>Smith v. GTE Corp.</u>, 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises."). The plaintiffs are correct that summary judgment pursuant to Rule 56 is not the correct procedure for dismissing based on lack of subject matter jurisdiction because "a grant of summary judgment is a decision on the merits . . . [but] a court must dismiss a case without ever reaching the merits if it concludes that it has no jurisdiction." <u>Capitol Leasing Co. v. Fed. Deposit Ins. Corp</u>, 999 F.2d 188, 191 (7th Cir. 1993). Furthermore, a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) may not be converted into a motion for summary judgment in the same way that a 12(b)(6) motion can. <u>See</u> <u>Region 8 Forest Serv. Timber Purchasers Council v. Alcock</u>, 993 F.2d 800, 807 n.8 (11th Cir. 1993). But that is not to say matters outside the pleadings should not be considered in deciding subject matter jurisdiction. Factually-based attacks on subject matter jurisdiction, such as the one in this case, "challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." <u>McMaster v. United States</u>, 177 F.3d 936, 940 (11th Cir. 1999) (citation and quotations omitted). The bottom line, then, is that the district court properly went beyond the pleadings in order to determine whether it lacked subject matter jurisdiction, regardless of the label we put on the procedure.

9

described the Rooker-Feldman doctrine as follows:

> The Rooker-Feldman doctrine provides that federal courts, other than the United States Supreme Court, have no authority to review the final judgments of state courts. The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are "inextricably intertwined" with a state court judgment. A federal claim is inextricably intertwined with a state court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.

Siegel v. LePore, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc) (citations and quotations omitted). However, even if a claim is "inextricably intertwined" with the state court's judgment, the doctrine does not apply if the plaintiff had no "reasonable opportunity to raise his federal claim in state proceedings." Powell v. Powell, 80 F.3d 464, 467 (11th Cir. 1996) (quoting Wood v. Orange County, 715 F.2d 1543, 1547 (11th Cir. 1983)).

The plaintiffs did not, strictly speaking, present any of the three federal claims asserted in their complaint in this case to the state court which considered the issues involving Michael's custody. We must decide whether the plaintiffs' federal claims nonetheless were "inextricably intertwined" with the state court judgment in the sense that "the federal claim[s] succeed[] only to the extent that the state court wrongly decided the issues before it," Siegel, 234 F.3d at 1172, and, if so, whether the plaintiffs had a reasonable opportunity to present their federal claims in the state court proceedings, see Powell, 80 F.3d at 467.

10

On two occasions we have considered and applied the Rooker-Feldman

doctrine in cases involving claims related to state child custody proceedings.  See

Liedel v. Juvenile Court of Madison County, Ala., 891 F.2d 1542 (11th Cir. 1990);

Staley v. Ledbetter, 837 F.2d 1016 (11th Cir. 1988).  In Staley, we held that the

Rooker-Feldman doctrine deprived the district court and this Court of jurisdiction

over a plaintiff's § 1983 claim in which "[s]he requested reinstatement of parental

custody and psychiatric care at state expense for her children and herself" based on

alleged violations of the Equal Protection and Due Process Clauses of the

Fourteenth Amendment.  837 F.2d at 1017.  We stated that the plaintiff "in essence

sought to reverse a state court's child custody determination" and held that:

> [N]o federal subject matter jurisdiction existed in this case.  In effect,
> Staley seeks to challenge collaterally the state agency and court
> proceedings that terminated her parental rights.  The federal courts are
> not a forum for appealing state court decisions.

Id. at 1017-18.

Similarly, in Liedel parents who were displeased with a state court's child

custody action brought a § 1983 action seeking "a temporary restraining order and

a permanent injunction against the Department [of Human Resources] and Juvenile

Court, preventing them from enforcing the Juvenile Court's prior orders and

preventing them from issuing further orders against the [plaintiffs]."  891 F.2d at

1544.  We reasoned  that the requested relief "would effectively nullify those state

11

orders," and therefore held that "[t]o the extent that the [plaintiffs'] federal court complaint seeks to challenge the final state court judgment, it must be dismissed for lack of jurisdiction under the Rooker-Feldman doctrine." Id. at 1545-46.

Those two decisions demonstrate that the Rooker-Feldman doctrine may deprive district courts and this Court of subject matter jurisdiction over claims related to child custody actions in state court, but their holdings alone do not tell us which of the three claims brought by the plaintiffs in this case are barred. Both Staley and Liedel involved far more direct attacks on the previous state court judgment than the claims in this case do. In fact, the primary relief sought in each of those two cases was an injunction preventing enforcement of the state court judgment and returning custody to the aggrieved parent. That is an easy case for application of the Rooker-Feldman doctrine.

By contrast, in this case the plaintiffs are not seeking injunctive relief that would prevent the enforcement of any child custody orders of the state court. They seek only damages based on the constitutional violations which they allegedly suffered. Because of that, the plaintiffs argue that the lack of a direct attack on the state court judgment and the fact that they seek damages, instead of injunctive relief, take their claims beyond the reach of the Rooker-Feldman doctrine. They cite to cases from other circuits in support of their argument, maintaining that we

12

should draw a distinction between cases in which a plaintiff seeks relief that would directly prevent the enforcement of a state court order and cases in which a plaintiff seeks damages under § 1983 based on the issues related to the state case.[7]

But our decisions focus on the federal claim's relationship to the issues involved in the state court proceeding, instead of on the type of relief sought by the plaintiff. See, e.g., Siegel, 234 F.3d at 1172. For example, in Liedel, even though part of the relief sought by the plaintiffs was damages from the Alabama Department of Human Resources, we held that the plaintiffs' claims were barred because their complaint essentially sought "to challenge the final state court judgment." 891 F.2d at 1544-46. And in Staley, 837 F.2d at 1017, we held that the Rooker-Feldman doctrine barred claims even though those claims, in part, sought damages to pay for psychiatric care. The Rooker-Feldman doctrine is broad

---

[7]In support of this argument, the plaintiffs point to the Third Circuit's opinion in Ernst v. Child and Youth Servs. of Chester County, 108 F.3d 486, 491-92 (3d Cir. 1997), and to the Sixth Circuit's opinion in Holloway v. Brush, 220 F.3d 767, 778-79 (6th Cir. 2000). In each of those cases, the courts permitted plaintiffs to maintain § 1983 damage claims in federal courts based on actions of state officials in connection with state custody proceedings. The Third Circuit held that the damages claims were not the "functional equivalent of an appeal from a state court judgment." Ernst, 108 F.3d at 491. The Sixth Circuit took a similar approach holding that such claims did not "constitute a review of the [state court's] custody decision." Holloway, 220 F.3d at 778. That court concluded that "the conceptual distinction could not be more clear" between a § 1983 damages claim and a claim seeking review of a state court judgment. Id. at 779. To the extent those decisions support the plaintiffs' position in this case, they are inconsistent with our circuit's law.

13

enough to bar all federal claims which were, or should have been, central to the state court decision, even if those claims seek a form of relief that might not have been available from the state court.

Applying these principles to the case before us, we readily conclude that the first of the plaintiffs' three claims, the one involving the search, is not "inextricably intertwined" with the state court custody proceeding in the sense that it is premised on the state court having ruled erroneously. While the allegedly illegal search of the plaintiffs' home occurred several days before the state custody proceeding was initiated, no evidence or other information derived from the search was introduced in the state court proceedings or was relied upon by the court when it decided to take away Goodman's custody of Michael. No issue involving the search was or could have been raised in the custody proceeding. This federal claim may succeed without in any way calling into doubt the state court decision. So, it is not barred. [8]

The other two claims are different matters. One of those claims contends that the Sipos affidavit was false and that the state court's ex parte proceeding violated the plaintiffs' due process rights. Those contentions strike at the heart of

---

[8]Of course, our determination that this claim is not barred by Rooker-Feldman does not in any way imply that it is meritorious. On remand, the district court is free to decide whether the claim is barred by qualified immunity or absolute immunity, as the defendants suggest, or to decide if the claim fails on the merits.

14

the state court's proceedings and judgment, because the state court decided to take away Goodman's custody of Michael only after finding Sipos' affidavit to be credible and finding that the ex parte order was justified. This claim "succeeds only to the extent that the state court wrongly decided" the custody issue. Siegel, 234 F.3d at 1172. So, the claim is barred if the plaintiffs had a reasonable opportunity to present it in the state court proceeding, a matter we will discuss shortly.

The plaintiffs' third claim is that Sipos violated Michael's due process rights when she threatened Scott with arrest if he did not return Michael to DFCS. That claim is inextricably intertwined with the state court orders and judgment, because the factual and legal predicate for it was the basis of a motion the plaintiffs filed to have Michael returned to Scott's custody. The state court held a hearing on that motion and denied it. For the plaintiffs to succeed on this claim a federal court would have to conclude that the state court erred. So, this claim, too, is barred if the plaintiffs had a reasonable opportunity to present it to the state court.

But did the plaintiffs have a reasonable opportunity to present their constitutional claims during the state juvenile court proceedings? See Wood v. Orange County, 715 F.2d 1543, 1547 (11th Cir. 1983). We think so. Georgia law permits constitutional challenges to a juvenile court's orders to be brought in the

15

juvenile court, and those challenges are subject to review by the Georgia Supreme Court, and ultimately by the United States Supreme Court. See, e.g., In re Suggs, 291 S.E.2d 233 (Ga. 1982) (considering constitutional challenge to state statute and juvenile court order on appeal from juvenile court).  The plaintiffs were both parties to the state court proceeding, and with the exception of the initial hearing on DFCS's ex parte petition to take custody, they were present and  participated in the state court proceedings.  Therefore, the plaintiffs had a reasonable opportunity to bring their constitutional challenges to the veracity of Sipos' affidavit and the propriety of the state court's ex parte proceeding in the state court.  Likewise, they had an opportunity to object, and did object, to the alleged threats to Scott and the effect of those threats on Michael's due process interests. It follows that the district court correctly determined that under the Rooker-Feldman doctrine it had no jurisdiction over the false affidavit, ex parte proceeding, and threat claims.

### III.  CONCLUSION

The district court's judgment is REVERSED insofar as the claim involving the allegedly illegal search is concerned.  It is AFFIRMED in all other respects. The case is REMANDED for further proceedings consistent with this opinion.