**In re Robert Wayne BURNS, Laura Kay Burns, Debtors.**

**Kevin L. Miller, Plaintiff,**

**v.**

**Robert Wayne Burns, Laura Kay Burns, Defendants.**

**Bankruptcy No. 6:07–bk–02304–KSJ. Adversary No. 6:07–ap–150.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Aug. 8, 2008.

---

Adam Lichtman, Ryan E. Davis, Winderweedle Haines Ward & Woodman PA, Orlando, FL, for Plaintiff.

Robert H. Pflueger, Robert H. Pflueger PA, Altamonte Springs, FL, for Defendants.

## MEMORANDUM OPINION

KAREN S. JENNEMANN, Bankruptcy Judge.

On May 13, 2005, the debtors' reddish Chow-mix dog, Teddy, lunged at Kevin Miller's motorcycle causing him to lose control of the bike. Miller was seriously injured. Teddy was killed. Although the debtors may still dispute Miller's version of the facts, a Florida state court, after conducting a full jury trial, entered a final judgment in Miller's favor for $500,000. The debtors filed this Chapter 7 bankruptcy case because they are unable to pay the judgment.

Miller, attempting to collect upon the judgment, objects [1] to the debtors' claim of exemptions asserting they are not entitled to claim the entire value of their home exempt pursuant to Section 522(q)(1)(B)(iv) of the Bankruptcy Code.[2] Miller also has filed an adversary proceeding [3] arguing that, pursuant to Section 727(a)(4) of the Bankruptcy Code, the debtors are not entitled to receive a discharge because they "knowingly and fraudulently" made false oaths in their bankruptcy schedules by failing to specifically list each and every household good they own and by failing to list interests in Florida tuition pre-payment plans purchased for their three children.

Although the debtors, Robert and Laura Burns, understandably would like to believe otherwise, based both on the binding final state court judgment and the evidence introduced by the parties in this case, the Court concludes that Teddy caused the motorcycle accident that seriously injured Miller. On the day of the accident, Miller was riding along the country road in front of the debtors' home with four friends. He and two other buddies were riding motorcycles. The fourth friend was following in a car for safety. Teddy ran into the road, initially lunging at Miller's other friends, but eventually targeting Miller and his motorcycle. Teddy was killed. Miller lost control. Both Miller and the bike went down with Miller suffering serious injuries. His friend driving the car wheeled Miller's motorcycle onto the debtors' property and immediately drove Miller to the emergency room.

The debtors had gotten Teddy as a family pet shortly after he was born in December 2001. He was neutered and appeared well-kept and behaved at his visits to a veterinarian between February 2002 and December 2004. (Plaintiff's Ex. No.

---

1. Miller's Objection to Property Claimed as Exempt is Document Number 16 in the Main Case. The debtors' written response is Document Number 18 in the Main Case.

2. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

3. Miller's complaint in this adversary proceeding (Adv.Pro. No. 07–150, Doc. No. 1) contained two counts contesting the debtors' right to receive a discharge. In Count One, Miller contends that the debtors made various false oaths in the bankruptcy schedules precluding discharge pursuant to Bankruptcy Code Section 727(a)(4). In Count Two, Miller argued that Section 727(a)(2) of the Bankruptcy Code precluded discharge contending that the debtors transferred or concealed property of the estate with the intent to hinder, delay or defraud a creditor. However, Miller presented no evidence of any improper transfers or concealment. As such, the Court concludes Miller intended to proceed only under Count One.

2). Teddy grew from a 21 pound puppy to a 72 pound dog. Prior to the accident, Teddy had received no known complaints or animal control infractions. Robert Burns testified that Teddy previously had never attacked anyone or chased cars. When Teddy was outside the house, he was on a chain unless Robert was supervising him. After the accident, Volusia County Animal Control did visit the debtors' property and, on May 24, 2005, issued a Notice of Violation for failure to restrain Teddy; however, by this point, Teddy already was dead. (Plaintiff's Ex. No. 3). The debtors consistently have maintained they had no knowledge of the accident. (Plaintiff's Ex. No. 6).

 Miller sued the debtors for damages he suffered from the accident. A jury awarded Miller $52,121.09 in actual damages for medical expenses, lost earning ability, and property damages, and $447,878.91 in damages for pain and suffering for a total award of $500,000.[4] A final judgment was entered based on the jury verdict on April 18, 2007.[5] (Plaintiff's Ex. No. 12). The debtors filed this Chapter 7 bankruptcy case on June 4, 2007, in large part because they are unable to pay the judgment amount.

The debtors operate a home inspection business—Egal of Central Florida, Inc. They earn approximately $50,000 per year and have three children still living at home. In addition, Robert's older son from a prior relationship resides with the debtors intermittently and often leaves his personal possessions at the debtors' home.

Miller raises two primary arguments. First, in the adversary proceeding, Miller argues that the debtors are not entitled to receive a discharge of their debts because they filed false schedules in this bankruptcy case. He asserts that the debtors did not fully list their personal property, primarily their household goods, and that they failed to list three prepaid tuition plans purchased for their children. Second, in his objection to exemptions in the main case, Miller argues that the debtors

---

4. Chapter 767 of the Florida Statutes is titled "Damage by Dogs" and governs owner liability. In *Jones v. Utica Mut. Ins. Co.*, 463 So.2d 1153, 1156 (Fla.1985), the Supreme Court of Florida explained that where a dog acts in an affirmative and aggressive manner, Section 767.01 becomes "a strict liability statute which has consistently been construed to virtually make an owner the insurer of the dog's conduct." In the Joint Statement of Factual Matters submitted by the parties at trial, the debtors concede that "[u]nder Florida law, there is strict liability for damages caused by an owner's doc." (p.3). The debtors, therefore, do not dispute they are financially responsible to Miller under the state court judgment.

5. The state court entered its final judgment pursuant to the jury's verdict awarding Miller $500,000, finding that the debtors owned Teddy and that Teddy was the legal cause of Miller's damages. (Debtors' Ex. Nos. 11 and 12). The Rooker–Feldman doctrine precludes this Court from reviewing issues adjudicated and inextricably intertwined with the state court's judgment. However, the doctrine "does not apply if the plaintiff had no 'reasonable opportunity to raise his federal claim in state proceedings.' " *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001) *(citing Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir.2000) (en banc); *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir.1996)). Here, the primary issue is whether the $500,000 judgment against the debtors arose from their willful or reckless misconduct resulting in serious injury to Miller in the five years preceding the petition date. The issue is unique to Section 522(q) of the Bankruptcy Code. Therefore, because the claims could not be raised in the state court, Rooker–Feldman is not determinative. Rooker–Feldman only precludes this court from considering whether the debtors owned Teddy and whether Teddy was the legal cause of Miller's damages because the state court already has decided and ruled upon those issues. The doctrine does not limit this Court's ability to resolve unique bankruptcy issues.

are not entitled to claim the full value of their home exempt pursuant to Section 522(q)(1)(B)(iv) of the Bankruptcy Code.

### Debtors' Home is Exempt from Miller's Claims

Considering Miller's objection to the debtors' homestead exemption, the debtors own no real estate other than their home located on 3.67 acres in Osteen, Florida, which Robert bought and has lived in since 1988. (Defendants' Ex. No. 13). The home is large (3,362 square feet) and is located on a small lake. Laura has lived in the home since her marriage to Robert in 1989. Robert added Laura to the title to the property in 1991. (Defendants' Ex. No. 14). The debtors claim the entire value of their home exempt from claims of creditors pursuant to Article X, Section 4 of the Florida Constitution.

On the date a debtor files a Chapter 7 bankruptcy petition, a broad estate is created consisting of all of the debtor's legal and equitable property interests. 11 U.S.C. § 541(d). The Bankruptcy Code permits a debtor to remove property from his or her estate using exemptions available under either federal or state law. 11 U.S.C. § 522(b); *In re Howe*, 241 B.R. 242, 245 (Bankr.M.D.Fla.1999). "The state of Florida has opted out of the federal exemptions scheme and requires its residents to claim only those exemptions available under Florida law." *In re Potter*, 320 B.R. 753, 756 (Bankr.M.D.Fla.2005) *(citing* Fla. Stat. § 222.20; *In re Sutton*, 272 B.R. 802, 806 (Bankr.M.D.Fla.2002)).

 The Florida Constitution grants Florida residents a homestead exemption in an unlimited dollar amount for residential real property that does not exceed one half an acre within a municipality or one hundred sixty acres if located outside of a municipality. Fla. Const. Art. X, Sect. 4(a)(1). A debtor's homestead is exempt from the claims of his or her creditors with only three exceptions: "(1) unpaid property taxes on the homestead itself, (2) mortgages for the purchase or improvement of the homestead, and (3) mechanic's liens for work performed on the homestead." *In re Hendricks*, 237 B.R. 821, 825 (Bankr. M.D.Fla.1999) *(citing* Fla. Const. Art. X, Sect. 4; *In re Clements*, 194 B.R. 923, 925 (Bankr.M.D.Fla.1996)). Each exception is narrowly construed in favor of the homeowner. *Butterworth v. Caggiano*, 605 So.2d 56 (Fla.1992).

 Miller originally objected to the debtors' homestead exemption because the size of the lot (3.67 acres) exceeds the amount allowed for homestead property located within a municipality (.5 acres). However, when Robert bought the homestead property in 1988, it was *outside* a municipality. Years later, in approximately 1995, the municipality of Deltona annexed the property. (Defendants' Ex. No. 17). Article X, Section 4(a)(1) of the Florida Constitution specifically addresses this situation and provides that a resident's homestead exemption "shall not be reduced without the owner's consent by reason of *subsequent* inclusion in a municipality ..." (emphasis added). Thus, even though the debtors' home exceeds .5 acres and now is located in the municipality of Deltona, the debtors' homestead protection is preserved. *Morgan v. Bailey*, 90 Fla. 47, 49, 105 So. 143 (Fla.1925) ("The homestead is not reduced in area without consent of the owner, by reason of its being subsequently included within the limits of an incorporated city or town."); *Manda v. Sinclair*, 278 F.2d 629 (5th Cir.1960). As such, the lot size of the debtors' home does not impact the debtors' ability to use Florida's expansive homestead protection.

Miller next argues that the debtors are not entitled to claim the entire value of their home exempt pursuant to Section

522(q)(1)(B)(iv) which provides that, if a debtor claims his residence exempt under state law, a debtor "may not exempt any amount of an interest in property described in subparagraph[s] (A) ... of subsection (p)(1) which exceeds in the aggregate $136,875, if ... (B) the debtor owes a debt arising from ... (iv) any willful or reckless misconduct that caused serious physical injury ... to another individual in the preceding five years." Here, the debtors have claimed the entire value of their home as exempt. The parties have stipulated that Miller was seriously injured in the motorcycle accident that occurred on May 13, 2005, less than five years before this bankruptcy case was filed. The issues that arise then are (1) whether Miller has met the requisite threshold to assert his claim of exemption (i.e., that the debtors acquired an interest in their home greater than $136,875 within 1,215 days of the bankruptcy filing), and (ii) whether the accident was caused by the "willful or reckless misconduct of the debtors."

In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) in part to prevent debtors, who bought luxurious and palatial homes shortly before bankruptcy and then used liberal state homestead laws, such as those in Florida, to escape liability from certain wrongful acts. Sections 522(*o*), (p) and (q) of the Bankruptcy Code. The congressional intent appears clear—debtors who commit wrongful acts and then transfer non-exempt assets into protected homestead property can no escape responsibility in a bankruptcy case.

The actual statutory language used to effectuate congress' goal is more difficult to parse. Section 522(q) prevents a debtor from claiming a home exempt if certain prerequisites or thresholds contained in Section 522(p) are met. Specifically, 522(q) provides that a debtor may not exempt property "described in subparagraphs (A) ... of subsection (p)(1) which exceeds in the aggregate $136,875." In turn, Section 522(p)(1)(A) provides that "a debtor may not exempt any amount of interest that was acquired by the debtor during the 1215–day period preceding the date of the filing of the petition that exceeds in the aggregate $136,875 in value in (A) real or personal property that the debtor ... uses as a residence."

█ The statutory threshold that Miller must meet under Section 522(p) and (q) therefore has two components. First, he must show that the debtors *acquired an interest* in their home within 1,215 days before they filed this bankruptcy case. Second, he must show that the *value* of the interest acquired during this period exceeds $136,875. The Court finds that Miller has failed to meet either threshold requirement.

As to the timing threshold, Section 522(q) only limits a debtor's homestead exemption to the extent that the debtor "acquired an interest" as defined in Section 522(p)(1) of the Bankruptcy Code. In relevant part, Section 522(p)(1)(A) provides that a debtor may not exempt an interest in any real property used as a residence that was acquired "during the 1215–day period preceding the date of the filing of the petition." Robert Burns bought his house in 1988. Laura Burns was added to the title in 1991. The debtors filed their bankruptcy petition on June 4, 2007, 19 years after Robert bought the house. The 1,215 day period preceding the filing of their bankruptcy petition reaches back to February 5, 2004.

█ The debtors acquired no interest in their home subject to the trustee's administration after February 5, 2004. The debtors certainly did not buy their home to avoid paying Miller's judgment entered over a decade later. During the 1,215–day

period preceding the filing of this bankruptcy case, the debtors made only regular monthly mortgage payments of $45,392.80. (Plaintiff's Ex. No. 18, Answer No. 23). Merely making regular mortgage payments is not the equivalent of "acquiring an interest" in real property. *In re Anderson,* 374 B.R. 848, 858 (Bankr. D.Kan.2007) ("This Court cannot conclude that prepayment of a mortgage debt, especially routine prepayment, is the moral equivalent of a maverick capitalist fleeing with his ill-got gains to establish a mansion homestead in Florida, Texas or Kansas."); *In re Sainlar,* 344 B.R. 669 (Bankr. M.D.Fla.2006); *In re Blair,* 334 B.R. 374 (Bankr.N.D.Tex.2005). As such, Miller has failed to prove the debtors acquired *any* interest in their home within the 1,215–day look back period.

■ As to the value threshold, even assuming that the pay down of a mortgage indirectly results in the acquisition of a greater interest in the home, Miller still has failed to meet the minimum dollar threshold needed to pursue an objection to the debtors' homestead exemption. Specifically, Section 522(p)(1) requires a debtor to acquire an interest valued at $136,875 or greater within the applicable 1,215–day period. At best, during the 1,215 day period, the debtors only acquired an interest of only $45,392.80, substantially less than $136,875. Miller has failed to meet the dollar threshold in Section 522(p) to raise an objection to the debtors' homestead under Section 522(q).

Although 522(q) clearly incorporates the time threshold requiring a debtor to acquire a homestead interest within 1,215 days prior to filing bankruptcy before allowing a creditor to object, Miller somewhat inexplicably ignores this timing threshold and argues that 522(q) of the

Bankruptcy Code merely requires the debtors to have a *present* interest in a home with a value exceeding $136,875. Although the Court rejects this argument, as held above, even if the Court alternatively were to accept Miller's position that no timing threshold exists, Miller still has failed to demonstrate that the debtors have sufficient equity in their home to deny them the right to claim the entire value of the home exempt.

The debtors initially claimed their home exempt and valued it at $509,000 in their bankruptcy schedules, reflecting a first mortgage of approximately $200,000 and a second mortgage of approximately $5,000 encumbering the property.[6] (Defendants' Ex. Nos. 2, Schedule A and 15). The debtors arrived at this estimated value by relying on an older appraisal and then reducing the amount to reflect current declining market conditions.

After this litigation was filed, the debtors hired a professional real estate appraiser, Michael Torkos, who has opined that the value of their home actually was $370,000 on June 4, 2007, the day they filed bankruptcy. (Defendants' Ex. No. 21). Mr. Torkos compared comparable sales in the same general area and adjusted the value for differences between the debtors' home and other homes. Although Miller challenged the accuracy of Mr. Torkos' opinion, the Court accepts the value. Mr. Torkos was a credible, thorough, and well qualified expert. He relied upon relevant market research, examined the debtors' home, and applied his research specifically to the facts of this case. As such, even though the debtors hoped the home had a higher value when they filed this bankruptcy case, the objective value as determined by a local real estate appraiser

---

**6.** The Volusia County Taxing Authority valued the home at between $489,860 and $510,097 on September 11, 2007. (Plaintiff's Ex. No. 22E).

after inspecting the property is $370,000. Subsequent to the appraisal, the debtors reduced their estimate of the home's value to $370,000. (Defendants' Ex. No. 25).

The home, undisputedly, was subject to two mortgages on the petition date of approximately $205,000,[7] leaving only $165,000 in value in which the debtors' claim "an interest." Pursuant to Section 522(q)(1)(B)(iv) of the Bankruptcy Code and ignoring the timing threshold of Section 522(p)(1), a single debtor can only retain an exempt interest in a home valued at $136,875 or less. Here, however, the debtors are married, and their case is being jointly administered. Section 522(m) provides that Section 522 exemptions "shall apply separately with respect to each debtor in a joint case."

The debtors claim that they are each entitled to a separate exemption of $136,875 allowing them to "stack" or double the amount ($136,875 × 2 = $273,750), pursuant to Section 522(m) of the Bankruptcy Code. *In re Rasmussen,* 349 B.R. 747, 753–755 (Bankr.M.D.Fla.2006) (explaining "stacking" and the entitlement of individual debtors to claim exemptions in a jointly administered case). If so, joint debtors can retain a home with a value of $273,750.

On the petition date, the debtors had actual equity in their home of only $170,000, which is substantially less than the $273,750 threshold required to allow a party to object to an otherwise valid homestead exemption. Therefore, according to the debtors, whether the accident occurred due to reckless misconduct is irrelevant. They are still entitled to retain their entire homestead as exempt.

Even if another court, however, were to find that the timing and dollar amount threshold of Sections 522(p) & (q) of the Bankruptcy Code did not apply, the Court alternatively holds that, although the accident injuring Miller was tragic, it was not caused by the willful or reckless misconduct of the debtors. Bankruptcy courts have looked to the Restatement of Torts in defining reckless misconduct. *In re Hill,* 265 B.R. 270, 276 (Bankr.M.D.Fla. 2001) (contrasting reckless misconduct with intentional misconduct in the context of Section 523(a)(6) willful and malicious exception to discharge); *In re Rainey,* 1 B.R. 569, 573 (Bankr.D.Or.1979). The Restatement (Second) of Torts, Section 500, Comment f distinguishes reckless misconduct from an intentional wrongdoing. An act results from reckless misconduct if the act was intended by the actor, even if the actor does not intend to cause the harm which results from it. "It is enough that he realizes or, from facts which he knows, should realize that there is a *strong probability* that harm may result, even though he hopes or even expects that his conduct will prove harmless." In *Lemay v. Kondrk,* 860 So.2d 1022, 1026 (Fla. 5th Dist.Ct.App.2003), the court found the terms "reckless," "willful," and "wanton" synonymous, holding that such behavior "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent...." See also *Williams v. City of Minneola,* 619 So.2d 983, 986 (Fla. 5th Dist.Ct.App.1993); *Dyals v. Hodges,* 659 So.2d 482, 484 (Fla. 1st Dist. Ct.App.1995).

To demonstrate the reckless misconduct of the debtors, Miller introduced a telephonic deposition of Ronald Paul Berman,

---

**7.** As of June 4, 2007, MorEquity held a first mortgage on the debtors' home of $199,656, and AmSouth Bank held a second mortgage on the home of $4,667. (Defendant's Ex. Nos. 15 and 16).

a self-professed expert in canine behavior. (Plaintiff's Ex. No. 15). Mr. Berman is a psychologist who evaluates animals' temperament and behavior to determine how they would act under stressful situations. He is a professional witness who has testified at least 177 times in trials conducted in 20 states. Berman has trained and evaluated dogs for many years, operating his current business, Best Behavior, since 1981. The vast majority of Mr. Berman's testimony relates to the numerous positions he has held with various groups involved in animal control and care and his numerous published articles and speaking events.

In connection with this case, however, Berman has had very limited involvement. He reviewed a portion of the state court and bankruptcy pleadings, Teddy's veterinary records, and certain legal statutes. He did not review the full record in either the state court or the bankruptcy court. He never met the debtors or Teddy, yet he rendered an opinion that "on or about Friday, May 13th, 2005, Robert and Laura Burns acted with reckless misconduct in allowing their four-year old Chow mix, Teddy, to be unrestrained." (Plaintiff's Ex. No. 15, pg. 30, lines 20–23). He based his opinion on certain factors: that the debtors' lived on a road, that their yard was at least partially unfenced, that Teddy typically was restrained with a chain, and that Teddy, a male Chow-mix, got insufficient exercise and had aggressive tendencies. In large part, the testimony was based on Mr. Berman's conclusion that "more Chows are aggressive than not." (Plaintiff's Ex. No. 15, pg. 38, line 21).

The Court rejects Berman's conclusion for several reasons. First and foremost, although Berman has vast experience in evaluating *animal* temperament, he has absolutely no experience or education in assessing *human* behavior. Probably all would agree that Teddy acted wrongly in lunging at Miller's motorcycle and, sadly, causing Miller's injuries and Teddy's death. Berman's assessment may even explain the reasons why Teddy acted as he did. However, nothing in Berman's experience or testimony gives him the ability to transfer his knowledge of pet psychology to interpret human culpability. He simply is unqualified to render an opinion as to whether the debtors, obviously people not pets, were reckless or not.

Second, Berman lacks credibility because he rendered his sweeping opinion based on very limited information. He certainly never met Teddy. He never visited the debtors' home or talked with them about their pets and how they controlled their dogs. The evidence does prove that Teddy had absolutely no history of aggressive behavior. No witness demonstrated that Teddy had ever chased a vehicle prior to this incident. The debtors simply had no reason to suspect that Teddy would cause such an accident.

■ In order to demonstrate that the debtors acted recklessly, Miller must prove that they exhibited "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." How can the debtors have known with "a strong probability" that Teddy would chase a motorcycle and cause an accident when he had never before exhibited any type of aggressive behavior? The evidence is undisputed that no one had ever complained of Teddy's behavior. He had never bitten or attacked anyone. He had never chased a car. Indeed, nothing in the evidence indicates he had ever run free before this one incident.

Third, the debtors had no active involvement in allowing Teddy to be unrestrained on the night of the accident. The debtors simply have no knowledge of the events

preceding or following the accident. They have no knowledge of how on this one particular evening Teddy was somehow able to roam unrestrained. The evidence fails to show that the debtors took any act, right or wrong, in causing the accident. In essence, Berman argues that, if a Chow mix male dog that sometimes is chained is loose, the owner is automatically acting "willfully and recklessly."

The Court rejects this automatic categorization finding that the reckless standard requires knowledge on the part of the dog owner that there is a strong probability that harm will result if a dog is loose. Here, nothing in Teddy's past behavior would lead to such knowledge nor did the debtors' actions indicate any type of willful or reckless misconduct. The accident was not caused by the debtors' reckless misconduct. As such, the Court concludes that Miller has failed to establish any willful or reckless misconduct that would allow him to object to the debtors' homestead exemption under Section 522(q) of the Bankruptcy Code.

The Court overrules Miller's objection to the debtors' homestead exemption (Doc. No. 16). Section 522(q) of the Bankruptcy Code does not apply because the debtors acquired no interest in the home within the 1,215 days preceding this bankruptcy filing and, even if the time threshold was inapplicable, the debtors' equity in their home is insufficient to allow a Chapter 7 trustee to administer the home. The accident was not caused by the debtors' willful or reckless misconduct.

### Debtors Are Entitled to Receive a Bankruptcy Discharge

In Adversary Proceeding Number 7–150, Miller next argues that the debtors are not entitled to receive a discharge under Section 727(a)(4) of the Bankruptcy Code. He asserts they made false oaths on their bankruptcy schedules by failing to list their personal property.

"A debtor's right to a fresh start is the primary objective of bankruptcy law." *Murphy v. Rivertree Landing, LLC,* No. 6:08–cv–198–Orl–31, 2008 WL 2224835, at *2 (M.D.Fla. May 27, 2008) *(citing In re Chauncey,* 454 F.3d 1292, 1295 (11th Cir.2006)). "As such, 'all debts that arose before the date of the order for relief' generally are discharged in Chapter 7 proceedings." Id. Courts construe the statutory exceptions to discharge liberally in favor of the debtor and recognize that the reasons for denying a discharge must be real and substantial, not merely technical and conjectural. *In re Miller,* 39 F.3d 301, 304 (11th Cir.1994). The party objecting to the debtor's discharge has the burden of establishing that the debtor is not entitled to receive a discharge by a preponderance of the evidence. *In re Chalik,* 748 F.2d 616 (11th Cir.1984).

As relevant here, Section 727(a)(4) of the Bankruptcy Code provides, in pertinent part, that the court shall grant the debtor a discharge of his debts, unless the "debtor *knowingly and fraudulently,* in or in connection with the case made a false oath or account." (Emphasis added.) A false oath must be *both* fraudulent and material to preclude discharge. A false oath or claim is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." *Chalik,* 748 F.2d at 618. Typically, as here, the asserted "false oath" is contained in the schedules or statements the debtor files when initiating a bankruptcy case.

Miller argues that the debtors failed to completely list their household goods and furniture in their bankruptcy schedules. The debtors valued their

household goods and furnishings at $1,375, using a quick, garage sale value, and claimed the entire amount as exempt. Pursuant to Article X, Section 4(a)(2) of the Florida Constitution, each spouse is entitled to claim up to $1,000 in personal property as exempt. Here, the debtors used $1,375 of their total $2,000 personal property exemption to retain their household goods. The debtors specifically listed the following items as their household goods and furnishings:

Iron Table, 6 Chairs, Small Wine Rack, Desk, Sofa, TV Stand, 13″ TV, Bed, Dresser, Armoire, Night Stand, 13″ TV, 2 Dressers, Tall Chest of Drawers, Kids Daybed, Dresser, Desk, Kids Bed, Dreser [sic], Armoire, Desk, Night Stand, Sofa, Loveseat, 10 yr old Big Screen TV, Chaise Lounge, Small Couch, TV, CD Player, Desk, Bookcase, Washer, Dryer, Tool Box, Misc. Hand Tools, Lawnmower, Misc. Yard Tools

The debtors separately listed their jewelry ($450), a 13 year-old computer ($10), and exercise equipment ($75).

The Trustee hired an appraiser, Robert H. Ewald of Ewald Enterprises, Inc, to inspect and appraise personal property located at the home of the debtors' in order to render an opinion as to the replacement value of those items. Mr. Ewald, an experienced appraiser, personally inspected these items. He prepared a detailed report listing the exact location and type of each item. (Plaintiff's Ex. No. 17). The list of items inspected by Mr. Ewald is much longer than the debtor's list; however, the items are all typical household goods and furnishings.[8] Mr. Ewald's photos document that the items are well-used, not extravagant, and typical of a normal home. He concluded the value of the items totals $7,199.

Neither the debtors nor Miller contest Mr. Ewald's assessment. Indeed, the debtors consent to paying the trustee the value reflected in Mr. Ewald's report over and above their claimed $1,375 exemption. Because the trustee objected to this value (Doc. No. 13 in the Main Case) and because the value was understated by the debtors, the Court will sustain the trustee's objection and require the debtors to pay or make arrangements to pay the difference ($7,199–$1,375 = $5,824) to the trustee within 30 days of the entry of this order.

The debtors did not list two items in their initial bankruptcy schedules—the three Florida Prepaid College Plans they had purchased for each of their three children and their pets.[9] (Plaintiff's Ex. No. 22a). Each plan, if paid in full, would allow their children to attend a 2–year community college program. At this point, the plans are only partially funded. For example, the debtors have paid $1,853.10 of the total amount required of $3,253.22 toward the tuition plan for one son. The amount paid into all three plans totals $4,399.65. (The total amount due is $10,086.03.) The debtors have made no payments into any of the three plans since December 2006. Question 11 on Schedule B specifically asks debtors to list any interests in certain specifically defined types of education plans.[10] No evidence indi-

---

8. Miller's lawyer and an assistant accompanied Mr. Ewald during his inspection of the debtors' home. The assistant took a number of photos of the debtors' household goods and furnishings. (Plaintiff's Ex. No. 25).

9. The debtors had another dog, Buster, and two rabbits on the petition date. The rabbits have since died.

10. Question 11 of Schedule B specifically asks debtors to list: "Interests in an education IRA as defined in 26 U.S.C. Section 503(b)(1) or

cates that the tuition programs the debtors purchased for their children are the type of education plans required to be listed in response to Question 11.

Miller, however, asserts that the incomplete listing of the debtors' household goods and other personal property coupled with their undervaluation of the items constitute false oaths sufficient to deny the debtors a discharge pursuant to Section 727(a)(4) of the Bankruptcy Code. He further cites the debtors' failure to list their pets and the education funds as additional examples of false oaths.

The Court finds that the debtors did not knowingly or fraudulently make any false statements in their bankruptcy schedules. They listed, perhaps in summary form, their household goods and personal property. They are not valuation experts and estimated the value of their personal property using a garage sale yardstick. Short of getting a professional appraisal, the debtors made an honest guess at the value of their used, household items.

Later, a professional, Mr. Ewald, listed and valued the same property. He certainly included a more specific description. He also used his experienced eye to assign an appropriate *replacement* value, as opposed to a quick, garage sale value. Mr. Ewald's opinion that the debtors' personal property had a value of $7,199 is not so dramatically different from the debtors' estimate of $1,375 as to shock the conscience or to support Miller's argument that the debtors were knowingly or fraudulently misrepresenting the extent of their assets on their bankruptcy schedules. The Court found the debtors' testimony credible. They listened to their attorney, completed their schedules to the best of their ability, and tried to be complete and accurate. They have cooperated with their

Chapter 7 trustee and have agreed to pay the difference between their and Mr. Ewald's estimate of value.

Certainly, the educational plans the debtors purchased for their children perhaps could and should have been listed, if they qualified, but, the Court concludes that any omission or undervaluation was entirely inadvertent and immaterial. No party has suggested that the trustee would try to administer the approximately $4,400 deposited into these funds. No prejudice to creditors has resulted.

Accordingly, the Court finds that Miller has failed to prove that the debtors made a false oath in their bankruptcy schedules sufficient to justify the denial of their discharge pursuant to Section 727(a)(4) of the Bankruptcy Code. Judgment will be entered in favor of the debtors and against Miller in Adversary Proceeding 7–150. Further, a separate order sustaining the trustee's objection to the debtors' claims of exemption and an order overruling Miller's objection to the debtors' claims of exemption simultaneously shall be entered consistent with this Memorandum Opinion.

under a qualified State tuition plan as defined in 26 U.S.C. Section 529(b)(1)."